**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

GLOBAL SYSTEMS INTEGRATION, INC.,

               Plaintiff,

v.

SWITCHBACK ADVISORS, LLC, RYAN
FAST, JONATHAN KOZELL, PERRY
KOUNTOURIOTIS, and EMERALD MORGAN,

               Defendants.

_____/

Case No.

Honorable

## <u>COMPLAINT</u>

Plaintiff, Global Systems Integration, Inc. ("GSI" or "Plaintiff"), by and through its counsel, Fisher & Phillips LLP, for its Complaint, states as follows:

## GENERAL ALLEGATION

1. This is an action brought by GSI against its former employees (Defendants Ryan Fast ("Fast"), Jonathan Kozell ("Kozell"), Perry Kountouriotis ("Kountouriotis"), and Emerald Morgan ("Morgan")) who breached their contractual and fiduciary duty to GSI in forming co-Defendant Switchback Advisors, LLC ("Switchback"), a competitor to GSI, during their GSI employment, violated their post-employment restrictive covenants with GSI, misappropriated GSI's trade secrets, and, along with Switchback, tortiously interfered with GSI's business relationship with its clients in the NetSuite Consultant Services industry.

1

## JURISDICTIONAL FACTS

2.     GSI is a Georgia corporation formed under the laws of Georgia.

3.     GSI is a NetSuite Consultant Services company, which is to say a business that helps businesses successfully implement, customize, and optimize NetSuite Enterprise Resource Planning. GSI also performs services to help businesses successfully implement, customize, and optimize JD Edwards Enterprise Resource Planning.

4.     GSI has operated in a wholly virtual environment since at least the COVID pandemic occurred in 2020.

5.     On information and belief, Kozell is domiciled in Highland, MI.

6.     Kozell is Switchback's registered agent.

7.     On information and belief, Kountouriotis is domiciled in Highland, MI.

8.     On information and belief, Fast is domiciled in West Bloomfield Township, MI.

9.     Switchback is a Michigan limited liability corporation that was incorporated back on or about February 6, 2025 (according to the Michigan Secretary of State's website) by Kozell, as well as, on information and belief, by Fast, Kountouriotis, and Morgan.

10.    On information and belief, Switchback was formed with the purpose of competing against GSI in the national NetSuite Consultant Services industry.

11. On information and belief, Kountouriotis, Kozell, Morgan, and Fast are the sole LLC members and founders of Switchback.

12. On information and belief, Morgan is domiciled in Chattanooga, TN.

13. This Court has general personal jurisdiction over Fast, Kozell, Kountouriotis, and Switchback as individuals and entities domiciled in Michigan.

14. Morgan's role as a founder of Switchback, while employed as a NetSuite Manager of Professional Services for GSI, provides this Court limited personal jurisdiction over Morgan for purposes of GSI's breach of fiduciary duty, breach of contract, and misappropriation of trade secrets claims against her per MCL 600.705(1).

15. On information and belief, Morgan is also an officer of Switchback in which role she knowingly encouraged and facilitated the misappropriation of GSI's confidential information and trade secrets, and performance of substantially equivalent GSI services by Switchback to GSI's clients. As such, this Court has limited personal jurisdiction over GSI's breach of contract, tortious interference, and trade secret misappropriation claims against Morgan as well per MCL 600.705(1), (2), or (6).

16. This Court has original jurisdiction over this action pursuant to 28 USC § 1331, as this matter involves a cause of action under the Defend Trade Secrets Act ("DTSA") 18 USC §§ 1831, et seq.

17. This Court has supplemental jurisdiction over the remaining state law claims herein pursuant to 28 USC § 1367 because the claims are so related to the DTSA claim for which this Court has original jurisdiction that they form part of the same controversy.

18. Venue is proper in this Court pursuant to 28 USC § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims for relief occurred in this District.

## GENERAL FACTS

19. GSI incorporates by reference all the aforementioned paragraphs as if restated herein.

### Kozell's Background and Breaches

20. Kozell and Kountouriotis were partners in a company called CGA, which was acquired by GSI in January 2022.

21. Kozell and Kountouriotis live in the same neighborhood and have known each other for over 35 years.

22. As part of GSI's acquisition of CGA, GSI employed Kozell as a Solutions Director – NetSuite.

23. On or about September 30, 2024, Kozell signed an Employment Agreement ("Kozell Agreement"), which was subsequently attached to a February

10, 2026, cease and desist letter sent to him (a copy of which is attached to the Complaint as **Exhibit A** and made a part of this Complaint).

24. Under Section 1(C) of the Kozell Agreement, the term "Confidential Information" was defined for the agreement as follows (emphasis added):

The term "Confidential Information" as used herein means information disclosed to, acquired or learned by the Employee as a consequence of his employment by the Company and not generally known to or by Competing Business (as defined in Section 1 (D) hereof) about the Business of the Company or the Company's financial affairs, including, without limitation, (1) **information relating to research, development, inventions, accounting, marketing, clients, all information of the foregoing type relating to any client of the Company, client lists, client account records, training and operations material and memoranda, personnel records, clients' business in general, (2) the identity of customers and prospects, their specific requirements, and the names, addresses and telephone numbers of individual contacts; (3) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals; (4) pricing policies, methods of delivering services and products, marketing and sales strategies, product know-how, product technology and product development strategies;** (5) physical security systems, access control systems, network and other equipment designs; (6) employment and payroll records; (7) forecasts, budgets and other non-public financial information; (8) **product performance information, product technical information and product know-how;** and (9) **expansion plans, management policies and other business strategies and policies,** and (10) and any other information treated by the Company as being confidential or labeled "Confidential," as well as all physical embodiments of any of the foregoing, all of which are hereby agreed to be the property of and confidential to the Company.

25. Under Section 5 of the Kozell Agreement:

Employee covenants and agrees that Employee will treat as confidential and will not use (other than in the performance of Employee's

5

designated duties to the Company) or disclose in any manner either during the term of Employee's association with the Company hereunder any Trade Secrets Employee also agrees that during Employee's association with the Company as defined hereunder, Employee will use Employee's best efforts to protect any such Trade Secrets against loss by inadvertent or unauthorized disclosure and will comply with regulations established by the Company for the purpose of protecting such information.

26.    Under Section 4 of the Kozell Agreement (emphasis added):

Employee acknowledges that the Company is in a highly competitive industry and that during Employee's employment with the Company, Employee will have access to, receive, learn develop and/or conceive technical customer, prospect, financial or other information that is proprietary and confidential to the Company that must be kept in strict confident to protect the Company's business and maintain its competitive position in the marketplace. Employees also is aware and acknowledges that such information would be useful to the Company's existing and potential competitors, for indefinite periods of time, and that possession of such information by clients or customers of the Company would be detrimental to the interests of the Company, **Employee therefore covenants and agrees that Employee will treat as confidential and will not, without the prior written approval of the Company, use (other than in the performance of Employee's designated duties to the Company), or disclose in any manner any Confidential Information, other than as necessary for the performance by Employee under this Agreement,** and

other than information which is a matter of public knowledge through no fault of Employee, or which has heretofore been or is hereafter published in any publication for public distribution or filed as public information with a governmental authority. Employee also agrees that during Employee's employment with the Company as described hereunder, Employee will use Employee's best efforts to protect any such Confidential Information against loss by inadvertent or unauthorized disclosure and will comply with any regulations established by the Company for the purpose of protecting such information.

6

27.    Under Section 2(B)(iii) of the Kozell Agreement:

For so long as Employee is employed by the Company, Employee agrees . . . (iii) not to engage in any activities whatsoever that are in competition with the Company, or which are in any way detrimental to or in conflict with the business interests of the Company.

28.    Under Section 9(A)-(B) of the Kozell Agreement:

(A) Non-Solicitation of Clients. During Employee's employment and for a period of one (1) year thereafter, Employee covenants and agrees that Employee shall not solicit, or attempt to solicit, any of the Company's clients, including actively sought prospective clients, with whom

(B) Employee had "material contact" during Employee's employment, for the purpose of providing products or services competitive with those provided by the Company. "Material Contact" exists between Employee and each customer or potential customer: (i) with whom Employee has dealt in an effort to further the business relationship within the twelve (12) months immediately prior to the last day worked; or (ii) whose dealings with Company were coordinated or supervised by Employee.

29.    Under Section 9(C) of the Kozell Agreement:

(C) Non-Solicitation of Employees. Employee agrees that, during the term of this Agreement and for a period of two (2) years after the termination of this Agreement, Employee shall not, directly or indirectly, on Employee's own behalf or on behalf of any person or other entity, solicit or induce, or attempt to solicit or induce any person who is an employee of the Company to terminate such person's employment with the Company, whether expressed in a written or oral agreement or understanding or otherwise.

30.    Under Section 10 of the Kozell Agreement:

Employee agrees that, without the written consent of the President of the Company, and for a period of one (1) year after Employee's employment with the Company, Employee will not, directly, or

7

indirectly, perform work for any person or entity that was a client or customer of the Company during the time that Employee was employed by the Company. Employee acknowledges that this means that, without such written consent, and during such period following termination of Employee's employment relationship with the Company, Employee will not work for or be involved in the business of any such client or customer of the Company in an executive, managerial, marketing, sales, technical, administrative, or product development capacity, whether as an owner, principal, partner, employee, consultant, contractor, agent or representative.

31.     To be clear, GSI is only seeking to enforce Section 10 of the Kozell Agreement to the extent Kozell has been and/or is still performing substantially similar services as he performed at GSI now for Switchback as to GSI clients he had material contact with while at GSI in the last 12 months of his GSI employment.

32.     Per Section 17 of the Kozell Agreement, Georgia law controls it.

33.     Per Kozell's Agreement, he was entering into it in exchange for continued employment and access to GSI's confidential information.

34.     As part of his job duties as a GSI Solutions Director – NetSuite and pursuant to the Kozell Agreement, Kozell was responsible for maintaining the secrecy of GSI's confidential information and trade secrets.

35.     As a GSI Solutions Director – NetSuite, Kozell had access to, among other confidential information and trade secrets: detailed client lists, detailed implementation processes and procedures, detailed estimates for clients (including methodology for making such estimates), detailed pricing information and lists,

detailed service methodologies, detailed marketing strategy documents and information, and details on client leads.

36.     As a GSI Solutions Director – NetSuite, Kozell worked hand-in-hand with many of GSI's clients, including Michigan-based Oakwood Veneer Company (located in Troy, MI).

37.     On information and belief, Kozell signing the Articles of Organization for Switchback on or about February 3, 2025, violated Section 2(B)(iii) of the Kozell Agreement, as Kozell was still employed by GSI at the time and Switchback was a competitor of GSI.

38.     On information and belief, Kozell and the other individual Defendants started planning how Switchback would compete against GSI, poach GSI's employees, and poach GSI's clients, around the time Kozell signed the Articles of Organization for Switchback.

39.     Kozell was the first of the individual Defendants to leave GSI on April 30, 2025.

40.     On information and belief, Kozell spent the time between forming Switchback and leaving GSI to download, print, and/or otherwise make copies of GSI's confidential information and trade secrets pertaining to, among other things, detailed client lists, detailed implementation processes and procedures, detailed estimates for clients (including methodology for making such estimates), detailed

pricing information and lists, detailed service methodologies, detailed marketing strategy documents and information, and details on client leads.

41. On information and belief, Kozell encouraged and instructed fellow Switchback founders/members (e.g., Fast, Morgan, and Kountouriotis) to download and/or print GSI's confidential information and trade secrets pertaining to, among other things, detailed client lists, detailed implementation processes and procedures, detailed estimates for clients (including methodology for making such estimates), detailed pricing information and lists, detailed service methodologies, detailed marketing strategy documents and information, and details on client leads, prior to leaving GSI at their respective times.

42. On information and belief, Kozell poached Morgan and Fast as GSI employees to join Switchback, or, alternatively, solicited Morgan and Fast to help start a competitor (i.e., Switchback) to GSI.

43. On information and belief, Kozell and/or Kountouriotis was or were the masterminds behind starting up a competitor (i.e., Switchback) to GSI while still employed by GSI.

44. GSI intends to image Kozell's personal cell phones and computers, as well as perform a thorough document review of Kozell's personal e-mail address (jon.kozell@gmail.com, as well as any others identified in discovery) to identify any

10

improper conversion, retention, or sharing of GSI's confidential information and trade secrets, as well as any poaching of GSI clients and employees.

45.   On information and belief, Kozell was and still is knowingly performing substantially similar services for GSI clients without proper approval that he had material contact with at GSI as a GSI Solutions Director – NetSuite, including Oakwood Veneer Company.

46.   Kozell's conduct as outlined in Paragraphs 37 to 38, 40 to 43, 45, and 47, in conjunction with facts that will be obtained in discovery will establish that Kozell violated Sections 2(B)(iii), 4-5, 9(A)-(C), and 10 of the Kozell Agreement.

47.   On information and belief, GSI believes that facts obtained in discovery will establish that Kozell misappropriated GSI's confidential and/or trade secret information to funnel to Switchback for competitive use.

### Fast Background and Breaches

48.   On or about January 27, 2022, Fast signed an Employment Agreement ("Fast Agreement"), which was subsequently attached to a February 10, 2026, cease and desist letter sent to him (a copy of which is attached to the Complaint as **Exhibit B** and made a part of this Complaint).

49.   Under Section 1(C) of the Fast Agreement, the term "Confidential Information" was defined for the agreement as follows (emphasis added):

> The term "Confidential Information" as used herein means information disclosed to, acquired or learned by the Employee as a consequence of

11

his employment by the Company and not generally known to or by Competing Business (as defined in Section 1 (D) hereof) about the Business of the Company or the Company's financial affairs, including, without limitation, (1) **information relating to research, development, inventions, accounting, marketing, clients, all information of the foregoing type relating to any client of the Company, client lists, client account records, training and operations material and memoranda, personnel records, clients' business in general, (2) the identity of customers and prospects, their specific requirements, and the names, addresses and telephone numbers of individual contacts; (3) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals; (4) pricing policies, methods of delivering services and products, marketing and sales strategies, product know-how, product technology and product development strategies;** (5) physical security systems, access control systems, network and other equipment designs; (6) employment and payroll records; (7) forecasts, budgets and other non-public financial information; (8) **product performance information, product technical information and product know-how;** and (9) **expansion plans, management policies and other business strategies and policies,** and (10) and any other information treated by the Company as being confidential or labeled "Confidential," as well as all physical embodiments of any of the foregoing, all of which are hereby agreed to be the property of and confidential to the Company.

50. Under Section 5 of the Fast Agreement:

Employee covenants and agrees that Employee will treat as confidential and will not use (other than in the performance of Employee's designated duties to the Company) or disclose in any manner either during the term of Employee's association with the Company hereunder any Trade Secrets Employee also agrees that during Employee's association with the Company as defined hereunder, Employee will use Employee's best efforts to protect any such Trade Secrets against loss by inadvertent or unauthorized disclosure and will comply with regulations established by the Company for the purpose of protecting such information.

51. Under Section 4 of the Fast Agreement (emphasis added):

12

Employee acknowledges that the Company is in a highly competitive industry and that during Employee's employment with the Company, Employee will have access to, receive, learn develop and/or conceive technical customer, prospect, financial or other information that is proprietary and confidential to the Company that must be kept in strict confident to protect the Company's business and maintain its competitive position in the marketplace. Employees also is aware and acknowledges that such information would be useful to the Company's existing and potential competitors, for indefinite periods of time, and that possession of such information by clients or customers of the Company would be detrimental to the interests of the Company, **Employee therefore covenants and agrees that Employee will treat as confidential and will not, without the prior written approval of the Company, use (other than in the performance of Employee's designated duties to the Company), or disclose in any manner any Confidential Information, other than as necessary for the performance by Employee under this Agreement,** and other than information which is a matter of public knowledge through no fault of Employee, or which has heretofore been or is hereafter published in any publication for public distribution or filed as public information with a governmental authority. Employee also agrees that during Employee's employment with the Company as described hereunder, Employee will use Employee's best efforts to protect any such Confidential Information against loss by inadvertent or unauthorized disclosure and will comply with any regulations established by the Company for the purpose of protecting such information.

52.    Under Section 2(B)(iii) of the Fast Agreement:

For so long as Employee is employed by the Company, Employee agrees . . . (iii) not to engage in any activities whatsoever that are in competition with the Company, or which are in any way detrimental to or in conflict with the business interests of the Company.

53.    Under Section 9(A) of the Fast Agreement:

(A) Non-Solicitation of Clients. During Employee's employment and for a period of one (1) year thereafter, Employee covenants and agrees that Employee shall not solicit, or attempt to solicit, any of the Company's clients, including actively sought prospective clients, with

13

whom Employee had "material contact" during Employee's employment, for the purpose of providing products or services competitive with those provided by the Company. "Material Contact" exists between Employee and each customer or potential customer: (i) with whom Employee has dealt in an effort to further the business relationship within the twelve (12) months immediately prior to the last day worked; or (ii) whose dealings with Company were coordinated or supervised by Employee.

54.    Under Section 9(B) of the Fast Agreement:

(B) Non-Solicitation of Employees. Employee agrees that, during the term of this Agreement and for a period of two (2) years after the termination of this Agreement, Employee shall not, directly or indirectly, on Employee's own behalf or on behalf of any person or other entity, solicit or induce, or attempt to solicit or induce any person who is an employee of the Company to terminate such person's employment with the Company, whether expressed in a written or oral agreement or understanding or otherwise.

55.    Under Section 10 of the Fast Agreement:

Employee agrees that, without the written consent of the President of the Company, and for a period of one (1) year after Employee's employment with the Company, Employee will not, directly, or indirectly, perform work for any person or entity that was a client or customer of the Company during the time that Employee was employed by the Company. Employee acknowledges that this means that, without such written consent, and during such period following termination of Employee's employment relationship with the Company, Employee will not work for or be involved in the business of any such client or customer of the Company in an executive, managerial, marketing, sales, technical, administrative, or product development capacity, whether as an owner, principal, partner, employee, consultant, contractor, agent or representative.

56.    To be clear, GSI is only seeking to enforce Section 10 of the Fast Agreement to the extent Fast has been and/or is still performing substantially similar

14

services as he performed at GSI now for Switchback as to GSI clients he had material contact with while at GSI in the last 12 months of his GSI employment.

57.  Per Section 17 of the Fast Agreement, Georgia law controls it.

58.  Per Fast's Agreement, he was entering into it in exchange for continued employment and access to GSI's confidential information.

59.  Fast had three roles at GSI after entering into the Fast Agreement: Senior NetSuite Consultant (through April '23), Manager of NetSuite Professional Services (through November of '24), and Director of NetSuite Services (through May '25).

60.  As part of his job duties for the three roles he held at GSI and pursuant to the Fast Agreement, Fast was responsible for maintaining the secrecy of GSI's confidential information and trade secrets.

61.  As a Director of NetSuite Services, Fast had access to, among other confidential information: detailed client lists, detailed implementation processes and procedures, detailed estimates for clients (including methodology for making such estimates), detailed pricing information and lists, detailed service methodologies, detailed marketing strategy documents and information, and details on client leads.

62.  As a Director of NetSuite Services, Fast worked hand-in-hand with many of GSI's clients, including Michigan-based Oakwood Veneer Company (located in Troy, MI).

63.     On information and belief, Fast, as a "Co-Founder/Partner" (per his LinkedIn page as of June 2026) helped facilitate the signing of the Articles of Organization for Switchback on or about February 3, 2025, which violated Section 2(B)(iii) of the Fast Agreement, as Fast was still employed by GSI at the time and Switchback was a competitor of GSI.

64.     On information and belief, Fast and the other individual Defendants started planning how Switchback would compete against GSI, poach GSI's employees, and poach GSI's clients, around the time Kozell signed the Articles of Organization for Switchback.

65.     Fast was the second of the individual Defendants to leave GSI on May 30, 2025.

66.     On information and belief, Fast spent the time between forming Switchback and leaving GSI to download, print, and/or otherwise make copies of GSI's confidential information and trade secrets pertaining to, among other things, detailed client lists, detailed implementation processes and procedures, detailed estimates for clients (including methodology for making such estimates), detailed pricing information and lists, detailed service methodologies, detailed marketing strategy documents and information, and details on client leads.

67.     On information and belief, Fast encouraged and instructed fellow Switchback founders/members (e.g., Kozell, Morgan, and Kountouriotis) to

16

download and/or print GSI's confidential information and trade secrets pertaining to, among other things, detailed client lists, detailed implementation processes and procedures, detailed estimates for clients (including methodology for making such estimates), detailed pricing information and lists, detailed service methodologies, detailed marketing strategy documents and information, and details on client leads, prior to leaving GSI at their respective times.

68.    GSI intends to image Fast's personal cell phones and computers, as well as perform a thorough document review of Fast's personal e-mail address (rfast87@gmail.com, as well as any others identified in discovery) to identify any improper conversion, retention, or sharing of GSI's confidential information and trade secrets, as well as any poaching of GSI clients and employees.

69.    On information and belief, Fast was and still is knowingly performing substantially similar services for GSI clients without proper approval that he had material contact with at GSI as a Director of NetSuite Services.

70.    On information and belief, Fast poached Morgan as a GSI employee to join Switchback, or, alternatively, solicited Morgan to help start a competitor (i.e., Switchback) to GSI.

71.    Fast's conduct as outlined in Paragraphs 63 to 64, 66 to 67, 69 to 70, and 72, in conjunction with facts that will be obtained in discovery will establish that Fast violated Sections 2(B)(iii), 4-5, 9(A)-(B), and 10 of the Fast Agreement.

72.     On information and belief, GSI believes that facts obtained in discovery will establish that Fast misappropriated GSI's confidential and/or trade secret information to funnel to Switchback for competitive use.

***Morgan Background and Breaches***

73.     On or about November 27, 2023, Morgan signed an Employment Agreement ("Morgan Agreement") (a copy of which is attached to the Complaint as **Exhibit C** and made a part of this Complaint).

74.     Under Section 1(C) of the Morgan Agreement, the term "Confidential Information" was defined for the agreement as follows (emphasis added):

> The term "Confidential Information" as used herein means information disclosed to, acquired or learned by the Employee as a consequence of his employment by the Company and not generally known to or by Competing Business (as defined in Section 1 (D) hereof) about the Business of the Company or the Company's financial affairs, including, without limitation, (1) **information relating to research, development, inventions, accounting, marketing, clients, all information of the foregoing type relating to any client of the Company, client lists, client account records, training and operations material and memoranda, personnel records, clients' business in general, (2) the identity of customers and prospects, their specific requirements, and the names, addresses and telephone numbers of individual contacts; (3) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals; (4) pricing policies, methods of delivering services and products, marketing and sales strategies, product know-how, product technology and product development strategies;** (5) physical security systems, access control systems, network and other equipment designs; (6) employment and payroll records; (7) forecasts, budgets and other non-public financial information; (8) **product performance information, product technical information and product know-how;** and (9) **expansion plans, management policies**

18

**and other business strategies and policies,** and (10) and any other information treated by the Company as being confidential or labeled "Confidential," as well as all physical embodiments of any of the foregoing, all of which are hereby agreed to be the property of and confidential to the Company.

75.    Under Section 5 of the Morgan Agreement:

Employee covenants and agrees that Employee will treat as confidential and will not use (other than in the performance of Employee's designated duties to the Company) or disclose in any manner either during the term of Employee's association with the Company hereunder any Trade Secrets Employee also agrees that during Employee's association with the Company as defined hereunder, Employee will use Employee's best efforts to protect any such Trade Secrets against loss by inadvertent or unauthorized disclosure and will comply with regulations established by the Company for the purpose of protecting such information.

76.    Under Section 4 of the Morgan Agreement (emphasis added):

Employee acknowledges that the Company is in a highly competitive industry and that during Employee's employment with the Company, Employee will have access to, receive, learn develop and/or conceive technical customer, prospect, financial or other information that is proprietary and confidential to the Company that must be kept in strict confident to protect the Company's business and maintain its competitive position in the marketplace. Employees also is aware and acknowledges that such information would be useful to the Company's existing and potential competitors, for indefinite periods of time, and that possession of such information by clients or customers of the Company would be detrimental to the interests of the Company, **Employee therefore covenants and agrees that Employee will treat as confidential and will not, without the prior written approval of the Company, use (other than in the performance of Employee's designated duties to the Company), or disclose in any manner any Confidential Information, other than as necessary for the performance by Employee under this Agreement,** and

other than information which is a matter of public knowledge through no fault of Employee, or which has heretofore been or is hereafter published in any publication for public distribution or filed as public information with a governmental authority. Employee also agrees that during Employee's employment with the Company as described hereunder, Employee will use Employee's best efforts to protect any such Confidential Information against loss by inadvertent or unauthorized disclosure and will comply with any regulations established by the Company for the purpose of protecting such information.

77.     Under Section 2(B)(iii) of the Morgan Agreement:

For so long as Employee is employed by the Company, Employee agrees . . . (iii) not to engage in any activities whatsoever that are in competition with the Company, or which are in any way detrimental to or in conflict with the business interests of the Company.

78.     Under Section 9(A)-(B) of the Morgan Agreement:

(A) Non-Solicitation of Clients. During Employee's employment and for a period of one (1) year thereafter, Employee covenants and agrees that Employee shall not solicit, or attempt to solicit, any of the Company's clients, including actively sought
prospective clients, with whom

(B) Employee had "material contact" during Employee's employment, for the purpose of providing products or services competitive with those provided by the Company. "Material Contact" exists between Employee and each customer or potential customer: (i) with whom Employee has dealt in an effort to further the business relationship within the twelve (12) months immediately prior to the last day worked; or (ii) whose dealings with Company were coordinated or supervised by Employee.

79.     Under Section 9(C) of the Morgan Agreement:

(C) Non-Solicitation of Employees. Employee agrees that, during the term of this Agreement and for a period of two (2) years after the termination of this Agreement, Employee shall not, directly or

20

indirectly, on Employee's own behalf or on behalf of any person or other entity, solicit or induce, or attempt to solicit or induce any person who is an employee of the Company to terminate such person's employment with the Company, whether expressed in a written or oral agreement or understanding or otherwise.

80.     Under Section 10 of the Morgan Agreement:

Employee agrees that, without the written consent of the President of the Company, and for a period of one (1) year after Employee's employment with the Company, Employee will not, directly, or indirectly, perform work for any person or entity that was a client or customer of the Company during the time that Employee was employed by the Company. Employee acknowledges that this means that, without such written consent, and during such period following termination of Employee's employment relationship with the Company, Employee will not work for or be involved in the business of any such client or customer of the Company in an executive, managerial, marketing, sales, technical, administrative, or product development capacity, whether as an owner, principal, partner, employee, consultant, contractor, agent or representative.

81.     To be clear, GSI is only seeking to enforce Section 10 of the Morgan Agreement to the extent Morgan has been and/or is still performing substantially similar services as he performed at GSI now for Switchback as to GSI clients she had material contact with while at GSI in the last 12 months of her GSI employment.

82.     Per Section 17 of the Morgan Agreement, Georgia law controls it.

83.     Per Morgan's Agreement, she was entering into it in exchange for continued employment and access to GSI's confidential information.

84.    Morgan had two roles at GSI after entering into the Morgan Agreement: NetSuite Consulting Manager (through August '24) and Manager of NetSuite Professional Services (through June of '25).

85.    As part of her job duties for the two roles she held at GSI and pursuant to the Morgan Agreement, Morgan was responsible for maintaining the secrecy of GSI's confidential information and trade secrets.

86.    As a Manager of NetSuite Professional Services, Morgan had access to, among other confidential information: detailed client lists, detailed implementation processes and procedures, detailed estimates for clients (including methodology for making such estimates), detailed pricing information and lists, detailed service methodologies, detailed marketing strategy documents and information, and details on client leads.

87.    As a Manager of NetSuite Professional Services, Morgan worked hand-in-hand with many of GSI's clients, including Michigan-based Oakwood Veneer Company (located in Troy, MI). Morgan performed the vast majority of GSI's services for Oakwood Veneer Company.

88.    On information and belief, Morgan, as a "Co-Founder & Consulting Partner" (per her LinkedIn page as of June 2026) helped facilitate the signing of the Articles of Organization for Switchback on or about February 3, 2025, which

violated Section 2(B)(iii) of the Morgan Agreement, as Morgan was still employed by GSI at the time and Switchback was a competitor of GSI.

89.     On information and belief, Morgan and the other individual Defendants started planning how Switchback would compete against GSI, poach GSI's employees, and poach GSI's clients, around the time Kozell signed the Articles of Organization for Switchback.

90.     Morgan was the third of the individual Defendants to leave GSI in June 2025.

91.     On information and belief, Morgan spent the time between forming Switchback and leaving GSI to download, print, and/or otherwise make copies of GSI's confidential information and trade secrets pertaining to, among other things, detailed client lists, detailed implementation processes and procedures, detailed estimates for clients (including methodology for making such estimates), detailed pricing information and lists, detailed service methodologies, detailed marketing strategy documents and information, and details on client leads.

92.     On information and belief, Morgan encouraged and instructed fellow Switchback founders/members (e.g., Kozell, Fast, and Kountouriotis) to download and/or print GSI's confidential information and trade secrets pertaining to, among other things, detailed client lists, detailed implementation processes and procedures, detailed estimates for clients (including methodology for making such estimates),

23

detailed pricing information and lists, detailed service methodologies, detailed marketing strategy documents and information, and details on client leads, prior to leaving GSI at their respective times.

93.    GSI intends to image Morgan's personal cell phones and computers, as well as perform a thorough document review of Morgan's personal e-mail address (emerald.morgan.3@gmail.com, as well as any others identified in discovery) to identify any improper conversion, retention, or sharing of GSI's confidential information and trade secrets, as well as any poaching of GSI clients and employees.

94.    On information and belief, Morgan was and still is knowingly performing substantially similar services for GSI clients without proper approval that she had material contact with at GSI as a Manager of NetSuite Professional Services.

95.    Morgan's conduct as outlined in Paragraphs 88 to 89, 91 to 92, 94, and 96, in conjunction with facts that will be obtained in discovery will establish that Morgan violated Sections 2(B)(iii), 4-5, 9(A)-(C), and 10 of the Morgan Agreement.

96.    On information and belief, GSI believes that facts obtained in discovery will establish that Morgan misappropriated GSI's confidential and/or trade secret information to funnel to Switchback for competitive use.

***Kountouriotis Background and Breaches***

97.     Kozell and Kountouriotis were partners in a company called CGA, which was acquired by GSI in January 2022.

98.     As part of the acquisition, GSI employed Kountouriotis as a Director of NetSuite Services—SMB.

99.     On or about January 25, 2022, Kountouriotis signed an Employment Agreement ("Kountouriotis Agreement"), which was subsequently attached to a March 27, 2026, cease and desist letter to him (a copy of which is attached to the Complaint as **Exhibit D** and made a part of this Complaint).

100.   Under Section 6 of the Kountouriotis Agreement, the term "Confidential Information" was defined for the agreement as follows (emphasis added):

> Employee acknowledges that the Company currently possesses, will develop and will come into possession of information that is owned by or may be valuable to the Company and its customers. **Employee will not use, exploit, reveal, divulge or make known to any person, firm, corporation or entity, any information or materials supplied by the Company or its customers to Employee or otherwise learned by Employee during his engagement with the Company**, including without limitation, accounting and financial information, customer lists and customer information, mailing lists, data bases, pricing, operating records, marketing strategies, processes, plans or other records, business practices and strategies, and commercial and other information or data, whether communicated in writing, orally, by observation or other sensory detection (individually and collectively, "Confidential Information"). The Confidential Information shall also include all letters, memoranda, notes, reports and other documents containing or referencing the Confidential Information, and all copies, reproductions and extracts thereof, prepared by Employee, the Company or its customers, employees or agents.

25

101.   Per Section 8 of the Kountouriotis Agreement:

8.    Work Product.   During Employee's employment with the Company, Employee may develop or conceive, in whole or in part, alone or with others, plans, manuals, handbooks, inventions, discoveries, improvements, trade secrets, secret processes and any technology, know-how or intellectual property, which results from any work Employee may do for or at the request of the Company (collectively, "Work Product"). All such Work Product will be deemed "work for hire" in accordance with the U.S. Copyright Act and shall be the Company's exclusive property, whether or not developed or made during business hours or with the use of the Company's facilities, equipment, materials, or personnel. Employee will promptly report all Work Product to the Company. Employee will assist the Company as necessary in obtaining patents or other protections for such Work Product.

102.   Per Section 18 of the Kountouriotis Agreement, Michigan law controls it.

103.   Per Kountouriotis' Agreement, he was entering into it in exchange for continued employment and access to GSI's confidential information.

104.   As part of his job duties as a Director of NetSuite Services—SMB and pursuant to the Kountouriotis Agreement, Kountouriotis was responsible for maintaining the secrecy of GSI's confidential information and trade secrets.

105.   As a Director of NetSuite Services—SMB, Kountouriotis had access to, among other confidential information: detailed client lists, detailed implementation processes and procedures, detailed estimates for clients (including methodology for making such estimates), detailed pricing information and lists,

26

detailed service methodologies, detailed marketing strategy documents and information, and details on client leads.

106. As a Director of NetSuite Services—SMB, Kountouriotis worked hand-in-hand with many of GSI's clients, including Michigan-based Oakwood Veneer Company (located in Troy, MI).

107. On information and belief, Kountouriotis, as a "Co-Founder" (per his LinkedIn page as of June 2026) helped facilitate the signing of the Articles of Organization for Switchback on or about February 3, 2025, which violated his common law duty of loyalty to GSI, as Kountouriotis was still employed by GSI at the time and Switchback was a competitor of GSI.

108. On information and belief, Kountouriotis and the other individual Defendants started planning how Switchback would compete against GSI, poach GSI's employees, and poach GSI's clients, around the time Kozell signed the Articles of Organization for Switchback.

109. On information and belief, Kountouriotis poached Morgan and Fast as GSI employees to join Switchback, or, alternatively, solicited Morgan and Fast to help start a competitor (i.e., Switchback) to GSI.

110. On information and belief, Kozell and/or Kountouriotis was or were the masterminds behind starting up a competitor (i.e., Switchback) to GSI while still employed by GSI.

27

111.   Kountouriotis was the last of the individual Defendants to leave GSI on January 30, 2026.

112.   On information and belief, Kountouriotis spent the time between forming Switchback and leaving GSI to download, print, and/or otherwise make copies of GSI's confidential information and trade secrets pertaining to, among other things, detailed client lists, detailed implementation processes and procedures, detailed estimates for clients (including methodology for making such estimates), detailed pricing information and lists, detailed service methodologies, detailed marketing strategy documents and information, and details on client leads.

113.   In fact, GSI knows via its IT Department that between Kountouriotis' January 5, 2026, notice of resignation effective January 30, 2026, Kountouriotis removed and backed up GSI's confidential information on a non-GSI device that had never been used to access GSI's systems via Kountouriotis' e-mail address credentials.

114.   In an affidavit obtained as part of the run up to the filing of this case ("Kountouriotis Aff.") (a copy of which is attached to the Complaint as **Exhibit E** and made a part of this Complaint), Kountouriotis admitted using a personal, non-GSI laptop to access files on GSI's systems (and also sync files within GSI's OneDrive), all conveniently since the day he started working at GSI. *See* Exhibit E

¶16. Even if true, Kountouriotis has provided no assurances that he deleted all the GSI confidential information from his alleged personal laptop.

115.  GSI's IT Department tracked Kountouriotis' decision to turn off the auto sync in OneDrive.

116.  Subsequently, Kountouriotis signed into GSI's system with a non-GSI device on January 9, 2026, at 11:37 AM using his work e-mail address and then synced the non-GSI device with OneDrive. This was the first time he had ever used the non-GSI device to access GSI's systems. There are only 2 device registrations indicating access to GSI's systems with Kountouriotis' work e-mail address; one of them was for the GSI laptop issued to him and the other was for the non-GSI device mentioned earlier.

117.  Kountouriotis pulled down data to that new device, and the last activity on the non-GSI device logged occurred on January 10, 2026, at 6:28 AM.

118.  Per Exhibit D, Kountouriotis left a digital trail of his various activities.

119.  The non-GSI device's "Device ID" was 2a0c9152-c614-486e-911d-902390189fbe.

120.  There is no legitimate business purpose for Kountouriotis syncing and uploading **all** the data (which, on information and belief, included GSI's confidential information and trade secrets) on his GSI-issued laptop to a non-GSI device.

29

121.   In January 2026, Kountouriotis also asked to purchase his four year old GSI computer, but human resources denied the request.

122.   Donna McDermott from GSI specifically asked for Kountouriotis to return the GSI laptop and provided him a means of sending it back (see Exhibit D).

123.   Kountouriotis returned his GSI-issued laptop on February 11, 2026.

124.   GSI has yet to access Kountouriotis' GSI-issued laptop in order to ensure a proper chain of custody during discovery and to avoid altering the metadata in a way that could (albeit remote in chance) enable Kountouriotis and his fellow co-Defendants to avoid liability for their unlawful actions and contractual breaches.

125.   On information and belief, Kountouriotis encouraged and instructed fellow Switchback founders/members (e.g., Fast, Morgan, and Kozell) to download and/or print GSI's confidential information and trade secrets pertaining to, among other things, detailed client lists, detailed implementation processes and procedures, detailed estimates for clients (including methodology for making such estimates), detailed pricing information and lists, detailed service methodologies, detailed marketing strategy documents and information, and details on client leads, prior to leaving GSI at their respective times.

126.   GSI intends to image Kountouriotis' personal cell phones and his GSI-issued computer, as well as perform a thorough document review of Kountouriotis' personal e-mail address (pkountouriotis@hotmail.com, as well as any others

30

identified in discovery) to identify any improper conversion, retention, or sharing of GSI's confidential information and trade secrets.

127.   Kountouriotis conduct as outlined in Paragraphs 107 to 110, 112 to 120, 125, and 128, in conjunction with facts that will be obtained in discovery will establish that Kountouriotis violated Sections 6 and 8 of the Kountouriotis Agreement.

128.   On information and belief, GSI believes that facts obtained in discovery, as well as those facts laid out in Paragraphs 112 to 120 and 125, will establish that Kountouriotis misappropriated GSI's confidential and/or trade secret information to funnel to Switchback for competitive use.

### *GSI Sends Cease & Desist Letters That Put Switchback Formally on Notice*

129.   GSI sent Fast and Kozell cease and desist letters on February 10, 2026.

130.   GSI requested the two provide certain written assurances by February 20, 2026, but none came till much later and, even then, the assurances were incomplete.

131.   GSI sent Morgan a similar cease and desist letter in Spring 2026 and also never got the full desired written assurances.

132.   Finally, GSI sent Kountouriotis a cease and desist letter on March 27, 2026, seeking certain written assurances by April 8, 2026; those full assurances were never provided.

31

133.   While Kountouriotis swore Switchback (i.e., Morgan, Fast, Kozell, and Kountouriotis) allegedly never solicited GSI clients, he essentially admitted that Switchback has been and still is performing substantially similar services for GSI clients as were being performed by GSI previously for those clients. *See, e.g.,* Exhibit E ¶¶40, 57. This is thus an admission that Morgan, Fast, and Kozell have violated Section 10 of the Fast Agreement, Kozell Agreement, and Morgan Agreement.

### *GSI Measures Taken to Maintain the Confidentiality of Its Confidential and Trade Secret Information*

134.   GSI has implemented procedures to maintain the secrecy of its confidential information and trade secrets, including but not limited to, keeping the electronic information password protected, ThreatLocker Device Protection, ThreatLocker DNS protection, SentinelOne EDR Device Protection, Global MFA enforcement, Employee VPN utilized, Bitlocker drive encryption, Microsoft Entra Conditional Access policies, Microsoft Intune device compliance enforcement, N-Central patch management (OS + third-party patching), N-Central monitoring & alerting, Exchange Online Protection / email filtering (anti-phishing, anti-spam), limiting dissemination of the information to those GSI employees with a need to know for the information, and requiring GSI employees sign agreements mandating that such information remain secret.

135.   GSI's detailed client lists, detailed implementation processes and procedures, detailed estimates for clients (including methodology for making such estimates), detailed pricing information and lists, detailed service methodologies, detailed marketing strategy documents and information, and details on client leads are information that GSI would not share with a competitor, and which were held in a secure manner in GSI's systems. No one is able to access them without having been issued proper access credentials as authorized by GSI. In the event an individual Defendant created such a piece of confidential information and/or trade secret, they had a contractual duty (see Exhibits A-D) to provide it to GSI to be properly secured.

136.   GSI's efforts to maintain the competitive advantages from maintaining the secrecy of its confidential information and trade secrets are rendered a nullity when, as in this case, former employees misappropriate said information that the employees had promised to keep secret.

137.   Notably, ThreatLocker was installed on GSI devices to prevent employees from using thumb drives, external hard drives, and other storage devices to download GSI information (or really any information) from GSI's systems.

138.   GSI's IT was strict about employees using non-GSI devices to access GSI's systems.

139. Morgan, Fast, Kozell, and Kountouriotis frequently tried to circumvent GSI's security measures all throughout their respective GSI employements.

140. In one instance Morgan used a non-GSI device to access GSI's systems. GSI IT tried to push its security measures onto the non-GSI device only to have Morgan wipe the non-GSI device.

## COUNT I: BREACH OF FIDUCIARY DUTY OF LOYALTY— INDIVIDUAL DEFENDANTS

141. GSI incorporates by reference all the aforementioned paragraphs as if restated herein.

142. The individual Defendants were employed by GSI in February 2025 when they formed a GSI competitor, Switchback.

143. The Individual Defendants remained employed by GSI after they formed a GSI competitor, Switchback.

144. The individual Defendants never disclosed Switchback's existence to GSI during their respective employment tenures.

145. By virtue of the individual Defendants employment with GSI, they owed GSI fiduciary duties and duties of loyalty, good faith, honesty, fair dealing, and full disclosure concerning matters within the scope of their GSI employment.

146. The individual Defendants were required to act in GSI's interests while employed by GSI, and were prohibited from using GSI's resources, confidential

34

information, business opportunities, or customer relationships for the individual Defendants' own benefit or the benefit of a competing business (e.g., Switchback).

147. The individual Defendants were required not to compete with GSI during their GSI employment.

148. The individual Defendants' fiduciary and loyalty obligations included, without limitation, the duties to: (a) refrain from diverting, usurping, or appropriating GSI's business opportunities; (b) refrain from using GSI's confidential, proprietary, or business-sensitive information for personal advantage or for the advantage of a competing business; (c) refrain from soliciting GSI's customers, prospective customers, vendors, or employees for a competing business while still employed by GSI; and (d) return and not misuse GSI's property, records, files, documents, data, customer information, pricing information, and other company materials.

149. The individual Defendants breached their fiduciary duties and duties of loyalty owed to GSI by secretly forming Switchback (a competitor to GSI) during their GSI employment.

150. The individual Defendants breached their fiduciary duties and duties of loyalty owed to GSI by using or disclosing GSI's confidential information and/or trade secrets, including, among other things, detailed client lists, detailed implementation processes and procedures, detailed estimates for clients (including

35

methodology for making such estimates), detailed pricing information and lists, detailed service methodologies, detailed marketing strategy documents and information, and details on client leads, for the benefit of Switchback during their GSI employment.

151. The individual Defendants breached their fiduciary duties and duties of loyalty owed to GSI by concealing their competing activities during their GSI employment.

152. On information and belief, the individual Defendants breached their fiduciary duties and duties of loyalty owed to GSI by using GSI's time, systems, equipment, documents, information, or other resources to advance Switchback during their GSI employment.

153. The individual Defendants' conduct was not merely lawful preparation to compete after termination of employment. Instead, they committed wrongful and unfair acts while still owing duties to GSI.

154. The individual Defendants' conduct was intentional, willful, malicious, and in conscious disregard of GSI's rights.

155. The individual Defendants' breaches were material and violated the trust and confidence GSI placed in them.

156. On information and belief, the individual Defendants gained profits, compensation, commissions, business opportunities, customer relationships,

36

goodwill, and/or other benefits as a result of their breaches of fiduciary duty and duty of loyalty.

157. Without the benefit of discovery, GSI is currently unable to identify with specificity the exact damage that has been done to GSI by the individual Defendants' breaches. Having stated that, as a direct and proximate result of the individual Defendants' breaches, GSI suffered damages in an amount to be proven at trial, including but not limited to: (a) lost profits, lost revenue, lost business, and lost customer relationships; (b) loss of business opportunities, bids, contracts, projects, and expectancies; (c) loss of goodwill and competitive position; (d) costs incurred to investigate, remediate, and mitigate the individual Defendants' misconduct; (e) costs incurred to recover or protect GSI's confidential information, data, property, and business relationships; (f) compensation, salary, commissions, bonuses, or other benefits paid to the individual Defendants during periods in which they acted disloyally, to the extent recoverable under Michigan law; (g) disgorgement of profits, compensation, commissions, or benefits wrongfully obtained by the individual Defendants; and (h) other consequential, incidental, equitable, and legal damages permitted by law.

## COUNT II: BREACH OF CONTRACT—FAST

158. GSI incorporates by reference all the aforementioned paragraphs as if restated herein.

159. On January 27, 2022, GSI and Fast entered into the Fast Agreement. Exhibit B.

160. Under the Fast Agreement, GSI agreed to provide Fast a job and access to GSI's confidential and trade secret information in exchange for him maintaining the information's secrecy and not using the information for unauthorized uses.

161. GSI employed Fast and provided him access to GSI's confidential and trade secret information until May 30, 2025 (i.e., when he left GSI's employment).

162. Fast failed to abide by Section 2(B)(iii) of the Fast Agreement as he helped form a competing business, Switchback, while employed by GSI and then engaged in competing conduct as specified in Paragraphs 63 to 64, 66 to 67, 135, 142 to 147, and 150-153, among others.

163. Fast failed to abide by Sections 4 and 5 of the Fast Agreement as he engaged in the conduct as specified in Paragraphs 63 to 64, 66 to 67, 72, 135 and 150, among others.

164. Fast failed to abide by Section 9(A) of the Fast Agreement as he engaged in the conduct as specified in Paragraphs 64 and 69, among others.

165. On information and belief, Fast failed to abide by Section 9(B) of the Fast Agreement as he solicited either Morgan to quit her GSI employment.

166. On information and belief, Fast failed to abide by the enforceable Section 10 of the Fast Agreement as he performed substantially similar services

while working for Switchback (without permission) for GSI clients he had material contact with while at GSI in the last 12 months of his GSI employment, including Oakwood Veneer Company.

167. To be clear, GSI is only seeking to enforce Section 10 of the Fast Agreement to the extent Fast has been and/or is still performing substantially similar services as he performed at GSI now for Switchback as to GSI clients he had material contact with during his GSI employment. Since Fast was violating this provision before the one year contractual period ended under the Fast Agreement, GSI is seeking relief such that GSI obtains a full year of compliance.

168. In addition to any other remedies available, GSI requests this Court issue an Order requiring: (a) an accounting of all GSI confidential and trade secret information taken by Fast; (b) an accounting of all GSI customers who Fast had material contact with in the last 12 months of his GSI employment that he either solicited away from GSI (up until May 30, 2026), personally performed substantially similar services for at Switchback, or both; (c) the destruction and deletion of all the information identified in the "(a)" accounting within Fast's or Switchback's possession; and (d) an accounting of all the people to whom Fast has disclosed any GSI trade secret or confidential information to.

## COUNT III: BREACH OF CONTRACT—KOZELL

169.   GSI incorporates by reference all the aforementioned paragraphs as if restated herein.

170.   On September 30, 2024, GSI and Kozell entered into the Kozell Agreement. Exhibit A.

171.   Under the Kozell Agreement, GSI agreed to provide Kozell a job and access to GSI's confidential and trade secret information in exchange for him maintaining the information's secrecy and not using the information for unauthorized uses.

172.   GSI employed Kozell and provided him access to GSI's confidential and trade secret information until April 30, 2025 (i.e., when he left GSI's employment).

173.   Kozell failed to abide by Section 2(B)(iii) of the Fast Agreement as he helped form a competing business, Switchback, while employed by GSI and then engaged in competing conduct as specified in Paragraphs 37 to 38, 40 to 43, 45, 47, 135, 142 to 147, and 150 to 153, among others.

174.   Kozell failed to abide by Sections 4 and 5 of the Kozell Agreement as he engaged in the conduct as specified in Paragraphs 38, 40 to 41, 47, 135, and 150, among others.

175.   Fast failed to abide by Section 9(A)-(B) of the Kozell Agreement as he engaged in the conduct as specified in Paragraphs 38 and 45, among others.

176.   On information and belief, Kozell failed to abide by Section 9(C) of the Kozell Agreement as he solicited either Morgan, Fast, or both to quit their GSI employment.

177.   On information and belief, Kozell failed to abide by the enforceable Section 10 of the Kozell Agreement as he performed substantially similar services while working for Switchback (without permission) for GSI clients he had material contact with while at GSI in the last 12 months of his GSI employment, including Oakwood Veneer Company.

178.   To be clear, GSI is only seeking to enforce Section 10 of the Kozell Agreement to the extent Kozell has been and/or is still performing substantially similar services as he performed at GSI now for Switchback as to GSI clients he had material contact with while at GSI in the last 12 months of his GSI employment. Since Kozell was violating this provision before the one year contractual period ended under the Kozell Agreement, GSI is seeking relief such that GSI obtains a full year of compliance.

179.   In addition to any other remedies available, GSI requests this Court issue an Order requiring: (a) an accounting of all GSI confidential and trade secret information taken by Kozell; (b) an accounting of all GSI customers who Kozell had

41

material contact with in the last 12 months of his GSI employment that he either solicited away from GSI (up until April 30, 2026), personally performed substantially similar services for at Switchback, or both; (c) the destruction and deletion of all the information identified in the "(a)" accounting within Kozell's or Switchback's possession; and (d) an accounting of all the people to whom Kozell has disclosed any GSI trade secret or confidential information to.

## COUNT IV: BREACH OF CONTRACT—MORGAN

180. GSI incorporates by reference all the aforementioned paragraphs as if restated herein.

181. On November 27, 2023, GSI and Morgan entered into the Morgan Agreement. Exhibit C.

182. Under the Morgan Agreement, GSI agreed to provide Morgan a job and access to GSI's confidential and trade secret information in exchange for her maintaining the information's secrecy and not using the information for unauthorized uses.

183. GSI employed Morgan and provided her access to GSI's confidential and trade secret information until June 2025 (i.e., when she left GSI's employment).

184. Morgan failed to abide by Section 2(B)(iii) of the Morgan Agreement as she helped form a competing business, Switchback, while employed by GSI and

then engaged in competing conduct as specified in Paragraphs 88 to 89, 91 to 92, and 135, among others.

185. Morgan failed to abide by Sections 4 and 5 of the Morgan Agreement as she engaged in the conduct as specified in Paragraphs 89, 91 to 92, 96, 135, and 150, among others.

186. On information and belief, Morgan failed to abide by Section 9(A)-(B) of the Morgan Agreement as she helped solicit away GSI clients she had material contact with, including Oakwood Veneer Company.

187. On information and belief, Morgan failed to abide by the enforceable Section 10 of the Morgan Agreement as she performed substantially similar services while working for Switchback (without permission) for GSI clients she had material contact with while at GSI in the last 12 months of her GSI employment, including Oakwood Veneer Company.

188. To be clear, GSI is only seeking to enforce Section 10 of the Morgan Agreement to the extent Morgan has been and/or is still performing substantially similar services as she performed at GSI now for Switchback as to GSI clients she had material contact with while at GSI in the last 12 months of her GSI employment. Since Morgan was violating this provision before the one year contractual period ended under the Morgan Agreement, GSI is seeking relief such that GSI obtains a full year of compliance.

43

189.   In addition to any other remedies available, GSI requests this Court issue an Order requiring: (a) an accounting of all GSI confidential and trade secret information taken by Morgan; (b) an accounting of all GSI customers who Morgan had material contact with in the last 12 months of her GSI employment that she either solicited away from GSI (up until June 2026), personally performed substantially similar services for at Switchback, or both; (c) the destruction and deletion of all the information identified in the "(a)" accounting within Morgan's or Switchback's possession; and (d) an accounting of all the people to whom Morgan has disclosed any GSI trade secret or confidential information to.

### COUNT V: BREACH OF CONTRACT—KOUNTOURIOTIS

190.   GSI incorporates by reference all the aforementioned paragraphs as if restated herein.

191.   On January 25, 2022, GSI and Kountouriotis entered into the Kountouriotis Agreement. Exhibit D.

192.   Under the Kountouriotis Agreement, GSI agreed to provide Kountouriotis a job and access to GSI's confidential and trade secret information in exchange for him maintaining the information's secrecy and not using the information for unauthorized uses, as well as providing him a laptop (and other tools) he could use to perform his job.

193.  GSI employed Kountouriotis and provided him access to GSI's confidential and trade secret information until January 30, 2026 (i.e., when he left GSI's employment).

194.  On January 23, 2026, Donna McDermott from GSI requested that Kountouriotis return his GSI-issued laptop and even provided him a shipping label and box. Donna McDermott also reminded Kountouriotis of his duty to return GSI property at the end of his employment.

195.  As outlined in Paragraphs 115 to 120, GSI knows that Kountouriotis synced a non-GSI device with his GSI-issued laptop shortly after giving his notice of resignation.

196.  Kountouriotis failed to abide by Sections 6 and 8 of the Kountouriotis Agreement as he engaged in the conduct as specified in Paragraphs 112 to 120, 125, 135, 150, and 195, among others.

197.  In addition to any other remedies available, GSI requests this Court issue an Order requiring: (a) an accounting of all GSI confidential and trade secret information taken by Kountouriotis; (b) the destruction and deletion of all the information identified in the "(a)" accounting within Kountouriotis' or Switchback's possession; (c) an accounting of all the people to whom Kountouriotis has disclosed any GSI trade secret or confidential information to; and (d) in the event

Kountouriotis wiped the GSI-issued laptop or otherwise returned it to factory settings, then an appropriate damages award for Kountouriotis' spoliation.

### COUNT VI: VIOLATION OF DTSA—INDIVIDUAL DEFENDANTS

198.   GSI incorporates by reference all the aforementioned paragraphs as if restated herein.

199.   The above-alleged facts constitute actual and threatened misappropriation of trade secrets by Defendants pursuant to the DTSA, 18 USC § 1831, *et seq.*, in one or more of the following respects.

200.   GSI's above-described trade secrets are subject to reasonable efforts by GSI to maintain their secrecy and/or confidentiality. GSI's confidential information, including but not limited to, detailed client lists, detailed implementation processes and procedures, detailed estimates for clients (including methodology for making such estimates), detailed pricing information and lists, detailed service methodologies, detailed marketing strategy documents and information, details on client leads, and so forth, are not generally known to the public, nor to competitors such as Switchback who can profit from its disclosure and/or use.

201.   Efforts to maintain secrecy include, but are not limited to, the items identified in Paragraph 134, and further including by having Fast, Kozell, Kountouriotis, and Morgan enter into contractual duties to maintain and preserve the confidentiality of GSI's confidential business information.

46

202.   The individual Defendants have misappropriated and misused GSI's confidential information without GSI's consent.  The individual Defendants engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty the individual Defendants owed and continues to owe to GSI as a former agent, employee, and representative of GSI.

203.   GSI derives a significant economic benefit from the above-described trade secrets.

204.   GSI faces an immediate threat of continuing irreparable harm, for which GSI lacks an adequate remedy at law, from the individual Defendants' ongoing misappropriation and misuse of GSI's trade secrets.

205.   Unless the individual Defendants are permanently enjoined from the foregoing conduct, GSI will be irreparably harmed by: (a) disclosure of trade secrets and other confidential information that is solely the property of GSI; (b) use of GSI's trade secrets to conduct business on behalf of a the individual Defendants' GSI competitor (e.g., Switchback), and/or to solicit customers on behalf of such competitor; (c) loss of confidentiality of GSI's confidential customer information, loss of goodwill, and/or loss of business reputation; and (d) potential for future economic loss, which is presently incalculable.

47

206. The individual Defendants' conduct constitutes a willful and malicious misappropriation of GSI's trade secrets.

207. Accordingly, GSI is entitled to injunctive relief to enjoin further legal violations, as well as damages in an amount to be proven at trial, to address as best as possible any harm that cannot be remedied by way of injunctive relief.

208. In particular, GSI requests this Court issue an Order requiring: (a) an accounting of all of the GSI trade secret and confidential information taken by the individual Defendants; (b) the return of all of the information identified in the accounting to GSI; (c) the destruction and deletion of all of the information identified in the accounting (including paper copies) within the individual Defendants' possession; and (d) an accounting of all the people to whom the individual Defendants have disclosed any GSI trade secret or confidential information to.

### COUNT VII: VIOLATION OF THE MICHIGAN UNIFORM TRADE SECRET ACT—ALL DEFENDANTS

209. GSI incorporates by reference all the aforementioned paragraphs as if restated herein.

210. On information and belief, the Defendants have in their possession GSI's confidential, proprietary, and trade secret information including without limitation: (1) detailed client lists; (2) detailed implementation processes and procedures; (3) detailed estimates for clients (including methodology for making such estimates); (4) detailed pricing information and lists; (5) detailed service

48

methodologies; (6) detailed marketing strategy documents and information; and (7) details on client leads.

211. GSI's detailed client lists, detailed implementation processes and procedures, detailed estimates for clients (including methodology for making such estimates), detailed pricing information and lists, detailed service methodologies, detailed marketing strategy documents and information, and details on client leads, are all valuable because they are not generally known because this information would allow a competitor to directly compete with GSI and/or gain a competitive edge because that competitor would not need to invest the time and money into developing the information contained within the documents.

212. Defendants also have in their possession GSI's information that is properly defined as a trade secret under the Michigan's Uniform Trade Secrets Act, MCL 445.1901 et. seq.

213. While employed by GSI, the individual Defendants needed to have access to some of GSI's confidential and proprietary information to perform their job duties, including communicating with GSI clients, quoting GSI clients for possible services, and providing said services to GSI clients.

214. The individual Defendants acquired access to GSI's trade secret information under circumstances giving rise to a duty to maintain the secrecy of or

to limit the use of the confidential and proprietary information they all acquired from GSI.

215. At the time the individual Defendants acquired access to GSI's trade secret information, they all owed a duty to GSI to maintain its secrecy and to limit the use of the information.

216. The individual Defendants exceeded their authorized access to GSI's information by, among other things, taking steps to transfer GSI's trade secret information from their GSI-owned laptops to either an external personal storage device, a personal online cloud storage, or both, or even in paper form, for purposes of personally retaining trade secret information to be used for unlawful purposes, such as competing directly with GSI (e.g., Switchback).

217. At some point after February 3, 2025, the individual Defendants transferred the GSI trade secret information in their possessions to Switchback.

218. On information and belief, the individual Defendants are the sole founders and members of Switchback.

219. Switchback knew that it acquired GSI's trade secret information through the individual Defendants' unlawful conduct.

220. Defendants' actions constitute improper acquisition of trade secrets in violation of the MUTSA.

50

221. Switchback, which is the individual Defendants' company, competes with GSI in the NetSuite Consultant Services industry.

222. GSI is entitled to compensatory damages and injunctive relief as a result of the Defendants' conduct.

223. The trade secret information the individual Defendants retained has value to them in their new positions at Switchback and, as such, value to their company, Switchback.

224. Defendants willfully and maliciously acquired GSI's trade secrets, entitling GSI to damages and attorney's fees in accordance with MCL 445.1904 & .1905.

225. The individual Defendants' actions have unjustly enriched the Defendants.

226. Defendants' continued possession of and access to GSI's confidential, proprietary, and trade secret information is causing irreparable injury to GSI for which there is no adequate remedy at law.

227. GSI will continue to suffer harm until its property is returned and Defendants are enjoined from using or distributing the same.

228. In particular, GSI requests this Court issue an Order requiring: (a) an accounting of all of the GSI trade secret and confidential information taken by the individual Defendants; (b) the return of all of the information identified in the

accounting to GSI; (c) the destruction and deletion of all of the information identified in the accounting (including paper copies) within the individual Defendants' possession; and (d) an accounting of all the people to whom the individual Defendants have disclosed any GSI trade secret or confidential information to.

## COUNT VIII: TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONSHIPS—ALL DEFENDANTS

229.    GSI incorporates by reference all the aforementioned paragraphs as if restated herein.

230.    There now exists, and at all relevant times have existed, actual business relations between GSI and its customers.

231.    Defendants have been, at all relevant times, aware of the existing business relations between GSI and its customers.

232.    Defendants' actions in soliciting GSI's customers through the use of confidential information misappropriated by the individual Defendants is unlawful and improper and constitutes intentional interference with GSI's present business relations.

233.    As a proximate result of Defendants' interference, GSI has been damaged in an amount it cannot yet ascertain, and which includes irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, by virtue of the foregoing acts and conduct complained of above, SGS demands the following relief:

52

1)    An Order requiring:

    a.  an accounting of all of the GSI trade secret and confidential information taken by the individual Defendants;

    b.  the return of all of the information identified in the accounting under 1)(a) to GSI;

    c.  the destruction and deletion of all of the information identified in the accounting (including paper copies) within the Defendants' possession; and

    d.  an accounting of all the people to whom the individual Defendants have disclosed any GSI trade secret or confidential information to.

2)  Permanent injunctive relief against Defendants prohibiting them from further wrongful possession and/or misuse of GSI's confidential information, including, but not limited to, any and all documents, computer-based files or data, or information in any form, whether originals, copies, compilations or derivations, and whether in electronic or hard copy format, which were downloaded or uploaded from GSI-issued laptops (or otherwise removed) or GSI's systems, or which were obtained by either Defendants or anyone acting on their behalf or in concert with them;

3)  All damages and relief identified in Paragraph 157;

4)  Disgorgement of any profits obtained by Switchback since February 3, 2025;

5) An Order:

    a. Extending the client non-solicitation clauses in Kozell's, Fast's, and Morgan's employment agreements to account for the period of their noncompliance;

    b. Extending the employee non-solicitation clauses in Kozell's and Fast's, employment agreements to account for the period of their noncompliance;

    c. Extending the no work for GSI clients clauses in Kozell's, Fast's, and Morgan's employment agreements (see Section 10 of each agreement) to account for the period of their noncompliance, but only as to performing substantially similar services for the GSI clients that Kozell, Fast, and Morgan performed while at GSI in the last 12 months of their respective GSI employments;

6) Compensatory damages in an amount proven at trial;

7) Exemplary and/or punitive damages;

8) Costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

9) Such other and further relief as the Court may deem equitable and just.

Respectfully Submitted,

**FISHER & PHILLIPS LLP**

54

By: /s/ Stephen R. Gee
Stephen R. Gee (P80673)
300 Park Street, Suite 370
Birmingham, MI 48009
(248) 540-8019
sgee@fisherphillips.com

Dated: August 4, 2026                    Attorneys for Plaintiff

# Exhibit A



fisherphillips.com

**Seattle**
1700 Seventh Avenue
Suite 2200
Seattle, WA 98101-4416

(206) 682-2308 Tel
(206) 682-7908 Fax

**Writer's Direct Dial:**
(206) 693-5075
**Writer's E-mail:**
cbelnavis@fisherphillips.com

February 10, 2026

**CERTIFIED MAIL
RETURN RECEIPT REQUESTED
AND
FIRST-CLASS MAIL**

Jonathan Kozell
1853 Grove
Highland, MI 48356

   Re:  *Your Legal Obligations Under Your Prior Employment Agreement*

Dear Mr. Kozell:

   This firm represents Global Systems Integration, Inc. ("GSI" or the "Company"). Please direct future communications to me.

   I am writing because it has come to GSI's attention that you have wrongfully solicited GSI employees to join a competitor company (Switchback Advisors, Inc.), may be using GSI's confidential business information and trade secrets, are unfairly competing with the Company through the use of confidential business information, and/or otherwise breached several obligations under the terms of your Employment Agreement ("Agreement") that you signed on or about September 30, 2024. (A copy of the Agreement is attached.) As a result, the Company will hold you (and any of your associates who have similar obligations) liable for any contractual breaches, tortious interference with business expectancies, misappropriation of trade secrets, and any other potential claims.

   I am writing to demand that you **immediately cease and desist** from unfairly competing with GSI and its products, processes, or services; using any of the Company's confidential information and trade secrets; soliciting employees and customers of the Company; and further violating the obligations set forth in the enclosed Agreement. I am further writing to inform you that GSI has instructed me to take all necessary action to protect its rights and interests.

**Fisher & Phillips LLP**
Atlanta · Baltimore · Boston · Charlotte · Chicago · Cleveland · Columbia · Columbus · Dallas · Denver · Detroit · Fort Lauderdale · Gulfport · Houston
Irvine · Kansas City · Las Vegas · Los Angeles · Louisville · McLean · Memphis · Minneapolis · Nashville · New Jersey · New Orleans · New York · Orlando
Philadelphia · Phoenix · Pittsburgh · Portland · Sacramento · San Diego · San Francisco · Seattle · Tampa · Washington, DC · Woodland Hills

Jonathan Kozell
February 10, 2026
Page 2

### *Your Obligation Not to Solicit Business or Employees*

You made a promise to the Company that you would not solicit any of your coworkers to leave GSI or any customers/clients to move their business from GSI:

9. AGREEMENT NOT TO SOLICIT BUSINESS OR EMPLOYEES

(A) Non-Solicitation of Clients. During Employee's employment and for a period of one (1) year thereafter, Employee covenants and agrees that Employee shall not solicit, or attempt to solicit, any of the Company's clients, including actively sought prospective clients, with whom

(B) Employee had "material contact" during Employee's employment, for the purpose of providing products or services competitive with those provided by the Company. "Material Contact" exists between Employee and each customer or potential customer: (i) with whom Employee has dealt in an effort to further the business relationship within the twelve (12) months immediately prior to the last day worked; or (ii) whose dealings with Company were coordinated or supervised by Employee.

(C) Non-Solicitation of Employees. Employee agrees that, during the term of this Agreement and for a period of two (2) years after the termination of this Agreement, Employee shall not, directly or indirectly, on Employee's own behalf or on behalf of any person or other entity, solicit or induce, or attempt to solicit or induce any person who is an employee of the Company to terminate such person's employment with the Company, whether expressed in a written or oral agreement or understanding or otherwise.

Thus, consistent with the Agreement, you cannot "solicit, or attempt to solicit, any of the Company's clients, including actively sought prospective clients" for a period of one year after the separation of employment, April 30, 2026. The ban prohibiting the solicitation of your coworkers exists for two years after separation, April 30, 2027.

In your position at Switchback Advisors, Inc., you are competing against the Company by engaging with other businesses in NetSuite Consultant Services. This is a direct violation of the restrictive covenants noted above. As such you are personally liable for any loss of business and related damages suffered by GSI.

### *Your Obligation to Return and Not to Use or Disclose Confidential Information*

While working for GSI, you had significant and direct access to and worked with confidential, proprietary, and trade secret information, including confidential information relating to the Company's customers and business. Section 5 of the Agreement contains your acknowledgment that it is important to maintain the secrecy and security of the Company's trade secrets:

FP 61646231.1

Jonathan Kozell
February 10, 2026
Page 3

## 5. TRADE SECRETS

Employee covenants and agrees that Employee will treat as confidential and will not use (other than in the performance of Employee's designated duties to the Company) or disclose in any manner either during the term of Employee's association with the Company hereunder any Trade Secrets  Employee also agrees that during Employee's association with the Company as defined hereunder, Employee will use Employee's best efforts to protect any such Trade Secrets against loss by inadvertent or unauthorized disclosure and will comply with regulations established by the Company for the purpose of protecting such information.

Moreover, Section 1(C) of the Agreement broadly defines Confidential Information:

(C)     The term "Confidential Information" as used herein means information disclosed to, acquired or learned by the Employee as a consequence of his employment by the Company and not generally known to or by Competing Business (as defined in Section 1 (D) hereof) about the Business of the Company or the Company's financial affairs, including, without limitation, (1) information relating to research, development, inventions, accounting, marketing, clients, all information of the foregoing type relating to any client of the Company, client lists, client account records, training and operations material and memoranda, personnel records, clients' business in general, (2) the identity of customers and prospects, their specific requirements, and the names, addresses and telephone numbers of individual contacts; (3) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals; (4) pricing policies, methods of delivering services and products, marketing and sales strategies, product know-how, product technology and product development strategies; (5) physical security systems, access control systems, network and other equipment designs; (6) employment and payroll records; (7) forecasts, budgets and other non-public financial information; (8) product performance information, product technical information and product know-how; and (9) expansion plans, management policies and other business strategies and policies, and (10) and any other information treated by the Company as being confidential or labeled "Confidential," as well as all physical embodiments of any of the foregoing, all of which are hereby agreed to be the property of and confidential to the Company.

Per Section 4 of the Agreement, you entered into a covenant to "treat as confidential and * * * not, without the prior written approval of the Company, use (other than in the performance of Employee's designated duties to the Company), or disclose in any manner any Confidential Information * * *."

Moreover, Michigan law prohibits misappropriation or misuse of trade secret information, including disclosure or use of a trade secret of another without express or implied consent. MCL 445.1902(b); 445.1903-.1904. Other states and courts do the same. *See Retirement Group v. Galante,* 176 Cal. App. 4th 1226, 1238 (2009) (noting that a court may enjoin a former employee "from using trade secret information to identify existing customers, to facilitate the solicitation of such customers, or to otherwise unfairly compete with the former employer").

GSI understands that, in your current position at Switchback Advisors, Inc., you and several of your peers, former GSI employees, are using GSI's customer data, preferences and other trade secrets in order to provide services to customers of your current employer. This misappropriation, removal, use, and/or disclosure of GSI's proprietary or confidential business information for the benefit of a competitor violates additional provisions of your Agreement and

FP 61646231.1

Jonathan Kozell
February 10, 2026
Page 4


the Uniform Trade Secrets Act, 1998 PA 448 (MCL 445.1901-.1910). This Act imposes liability for trade secret misappropriation in addition to, and separate from, your contractual obligations not to unfairly compete with the Company.

### *Demands and Requested Assurances*

We insist that you abide by all your obligations to the Company, including those outlined above. GSI will vigorously protect its Confidential Information, trade secrets, and property, in addition to preventing any unfair competition and the solicitation of its employees and customers. GSI is fully prepared to defend its rights should you choose to breach these obligations in any way.

Accordingly, GSI demands that you take the following actions:

1. Immediately purge from your possession and return to me as GSI's representative all Confidential Information (as defined in your Agreement) in your possession relating to the Company's business or its customers and provide me with a written assurance confirming that you have done so. In the event that you have any Confidential Information stored on your personal mobile phone, portable electronic device, computer, or in any other electronic format, GSI demands that you immediately (a) cease using or accessing such information; (b) not allow any third party to use or access it; (c) ensure that such information is preserved and is not deleted or altered in any way; and (d) notify me so that arrangements may be made to remove such data without destroying it or altering its integrity as potential evidence.

2. Immediately cease and desist from using or disclosing all Confidential Information and provide me with written assurance confirming that you will refrain from such use and disclosure.

3. Provide me with a list of all third parties to whom you have disclosed any Confidential Information so that we may work to remedy such disclosures.

4. Provide me with a list of every Company customer or client, current or prospective, with whom you have communicated in any way following your departure from the Company, as well as the details of the method of each such communication (i.e., mailing, phone call, email, text message, etc.).

5. Immediately take steps necessary to ensure that any and all documents related to the matters addressed herein (including with regard to demand #1) are preserved and not deleted or altered in any way so that they will be available as evidence **(this demand is imperative; you must not destroy any evidence related to the matters addressed in this letter)** and provide a written assurance confirming that you have done so. Specifically, you should take appropriate steps to preserve all paper, electronic, or other records, including but not limited to, emails, text messages, or other communications, that relate in any way to: (i) the Company; (ii) your consideration and acceptance of employment with any

FP 61646231.1

Jonathan Kozell
February 10, 2026
Page 5

new employer; (iii) the Company's customers; and (iv) any use or disclosure of the Company's Confidential Information, trade secrets, or property. This preservation obligation extends to any and all hard copy documents and electronic storage devices, including computers, smart phones, tablets, USB drives, and other devices, as well as emails, instant messages, documents, or other records stored in the cloud or on third-party devices, including LinkedIn, Gmail, Yahoo, iCloud, Slack, Teams, or other third-party email or messaging services.

6.    Provide written confirmation that you intend to honor all the contractual obligations found in the Agreement.

7.    Provide written confirmation that you will not solicit, recruit, or otherwise interfere with GSI's employees.

We demand that you make these written assurances by **5:00 p.m. on February 20, 2026**. It is further requested that you immediately contact me or have your counsel contact me to discuss whether there is any possibility to avoid litigation. Nothing contained in or omitted from this letter is or shall be deemed a limitation, restriction, or waiver of any rights or remedies, either at law or in equity, in connection with any of the matters raised in this letter, all of which are expressly reserved.

**This matter involves important legal issues, and you may wish to contact an attorney.** We look forward to your cooperation. Please contact me directly if you have any questions about this matter.

Sincerely,

Clarence M. Belnavis
For FISHER & PHILLIPS LLP

Enclosure: as stated
CMAB:cmc

FP 61646231.1

## McClintock, Cyndi

| | |
|---|---|
| **From:** | McClintock, Cyndi |
| **Sent:** | Wednesday, February 11, 2026 4:50 PM |
| **To:** | jon.kozell@gmail.com |
| **Cc:** | McClintock, Cyndi; Belnavis, Clarence |
| **Subject:** | Global Systems Integration, Inc. - Cease and Desist |
| **Attachments:** | 2026.02.10 Cease and Desist Letter to Jonathan Kozell.pdf; SIGNED Employee Agreement Kozell, Jon.pdf |

**Sent on behalf of Clarence Belnavis**

Dear Mr. Kozell,

Please see the attached correspondence from Clarence Belnavis together with the enclosure referenced therein.  The letter and enclosure were sent to you by first-class mail and certified mail on February 10, 2026.

We look forward to your response.

Thank you,
Cyndi McClintock



**Cyndi McClintock**
**Legal Secretary**
Fisher & Phillips LLP
560 SW Tenth Avenue | Suite 450 | Portland, OR 97205
cmcclintock@fisherphillips.com
O: (503) 205-8067

Website

*This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error, then immediately delete this message.*

1

Docusign Envelope ID: 6406485C-D2D4-4407-9162-C506643133BF





Initial

## EMPLOYMENT AGREEMENT

THIS AGREEMENT entered into as of this 30th day of September 2024, between GLOBAL SYSTEMS INTEGRATION, INC., a Georgia corporation (hereinafter called the "Company"), and Jonathan Kozell (hereinafter called "Employee").

## W I T N E S S E T H:

WHEREAS the Company desires to employ Employee and Employee desires to accept employment on the terms and conditions hereinafter stated; and

WHEREAS, in the course of Employee's employment, Employee will, in carrying out Employee 's unique services to the Company, have access to corporate planning material and confidential employment material and will gain knowledge of confidential information relating to the business, affairs, clients and methods of the Company and its clients, and techniques in the provision of the Company's services through the use of systems, forms and methods used and devised by the Company or at the Company's expense, will have access to lists of the Company's clients and their needs, and will become personally known to and acquainted with the Company's clients; and

WHEREAS the Company would suffer irreparable harm if Employee were to use such knowledge, information and personal relationships in competition with the Company.

NOW, THEREFORE, in consideration of the employment of Employee by Company, the promises and mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt, adequacy and sufficiency of which is hereby acknowledged by the parties, and the intent of both parties to be legally bound by the terms of this agreement throughout the term of Employee's employment with Company, and thereafter as provided herein, the parties agree as follows:

## 1. DEFINITIONS

(A)     The term "Business" as used herein means sales, pre-sales, and/or consulting with regards to Oracle's JD Edwards OneWorld® / EnterpriseOne® software and supporting technologies, Oracle's E-Business Suite software and supporting technologies, and Oracle's Enterprise software and supporting technologies.

(B)     The term "Trade Secrets" as used herein includes, without limitation, the whole or any part or phase of any scientific or technical information, design, process, procedure, improvement, invention, plan, technique of production or service, or method or system which is used by and known only to the Company and Company's clients and to those of its employees and independent contractors to whom it has been confided in order to achieve its intended use. "Trade

Secrets" also include all other property, things or information which would be considered trade



Initial

secrets under the Georgia Trade Secrets Act or under any amendments thereto, and other applicable law which Act, Amendments and other applicable law, if any, are specifically incorporated herein by reference and made a part hereof.

(C)     The term "Confidential Information" as used herein means information disclosed to, acquired or learned by the Employee as a consequence of his employment by the Company and not generally known to or by Competing Business (as defined in Section 1 (D) hereof) about the Business of the Company or the Company's financial affairs, including, without limitation, (1) information relating to research, development, inventions, accounting, marketing, clients, all information of the foregoing type relating to any client of the Company, client lists, client account records, training and operations material and memoranda, personnel records, clients' business in general, (2) the identity of customers and prospects, their specific requirements, and the names, addresses and telephone numbers of individual contacts; (3) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals; (4) pricing policies, methods of delivering services and products, marketing and sales strategies, product know-how, product technology and product development strategies; (5) physical security systems, access control systems, network and other equipment designs; (6) employment and payroll records; (7) forecasts, budgets and other non-public financial information; (8) product performance information, product technical information and product know-how; and (9) expansion plans, management policies and other business strategies and policies, and (10) and any other information treated by the Company as being confidential or labeled "Confidential," as well as all physical embodiments of any of the foregoing, all of which are hereby agreed to be the property of and confidential to the Company.

(D)     The term "Competing Business" as used herein means any person, concern or entity which is engaged in or conducts a business substantially similar to the Business.

## 2. TERM AND DUTIES

(A)     Employee shall use Employee's best efforts to perform Employee's duties in a manner which is in the best interest of the Company.  Employee's responsibilities shall include computer systems consulting and such other duties consistent with his position with the Company as may from time to time be assigned to Employee by the President of the Company.

(B)     For so long as Employee is employed by the Company, Employee agrees

(i)     to devote all Employee's time, energy, and skill during business hours to the performance of the duties of Employee's employment and as otherwise requested by the Company (vacations and reasonable absences due to illness excepted), and

(ii)     not to engage directly or indirectly in any active work (other than pursuant to

this Agreement) without the prior written consent of the President or such other person as the Executives of the Company shall designate from time to time.

2

Docusign Envelope ID: 6406485C-D2D4-4407-9162-C506643133BF



Initial

(iii)     not to engage in any activities whatsoever that are in competition with the Company, or which are in any way detrimental to or in conflict with the business interests of the Company.

(C)     All funds and property received by Employee on behalf of the Company shall be received and held by Employee in Employee's capacity as an employee of the Company, and the Employee shall account for and remit all such funds to the Company.

(D)     Any and all funds (commissions and/or royalties) Employee may still receive from previous engagements prior to employment with Company shall remain with Employee.  Company asserts no right or ownership in those funds.

## 3.  CONFIDENTIALITY OF EMPLOYMENT AGREEMENT

The contents and terms of this Agreement are confidential, and Employee agrees not to disclose nor discuss the terms of this Agreement with anyone, including but not limited to, any of the Company's other employees, clients, business associates, competitors or any other party other than Employee's legal counsel.  Any violation of this provision shall constitute breach of contract and shall subject Employee to the default provisions of this Agreement.

## 4. CONFIDENTIAL INFORMATION

Employee acknowledges that the Company is in a highly competitive industry and that during Employee's employment with the Company, Employee will have access to, receive, learn develop and/or conceive technical customer, prospect, financial or other information that is proprietary and confidential to the Company that must be kept in strict confident to protect the Company's business and maintain its competitive position in the marketplace.  Employees also is aware and acknowledges that such information would be useful to the Company's existing and potential competitors, for indefinite periods of time, and that possession of such information by clients or customers of the Company would be detrimental to the interests of the Company, Employee therefore covenants and agrees that Employee will treat as confidential and will not, without the prior written approval of the Company, use (other than in the performance of Employee's designated duties to the Company), or disclose in any manner any Confidential Information, other than as necessary for the performance by Employee under this Agreement, and

other than information which is a matter of public knowledge through no fault of Employee, or which has heretofore been or is hereafter published in any publication for public distribution or filed as public information with a governmental authority.  Employee also agrees that during Employee's employment with the Company as described hereunder, Employee will use Employee's best efforts to protect any such Confidential Information against loss by inadvertent or unauthorized disclosure and will comply with any regulations established by the Company for the purpose of protecting such information.

Docusign Envelope ID: 6406485C-D2D4-4407-9162-C506643133BF





Initial

## 5. TRADE SECRETS

Employee covenants and agrees that Employee will treat as confidential and will not use (other than in the performance of Employee's designated duties to the Company) or disclose in any manner either during the term of Employee's association with the Company hereunder any Trade Secrets  Employee also agrees that during Employee's association with the Company as defined hereunder, Employee will use Employee's best efforts to protect any such Trade Secrets against loss by inadvertent or unauthorized disclosure and will comply with regulations established by the Company for the purpose of protecting such information.

## 6.  RECORDS AND EMPLOYEE INVENTIONS

(A)    All records, notes, files, memoranda, reports, price lists, client lists, media lists, drawings, plans, sketches, documents, equipment, apparatus and like items, and all copies thereof, relating to the Business of the Company, Confidential Information or Trade Secrets, which shall be prepared by Employee or which shall be disclosed to or which shall come into the possession of Employee, shall be and remain the sole and exclusive property of the Company.  Employee agrees that upon the termination of his employment by the Company, or at any other time upon request, Employee will promptly deliver to the Company the originals and all copies of any of the foregoing that are in Employee's possession, custody or control, and any other property belonging to the Company.

(B)    Any invention, design, improvement, discovery, formula, method, creative work, copyright or other intellectual property relating to or useful in connection with any business conducted by the Company, now or in the future, which is made or discovered or which comes to the attention of the Employee while employed by the Company will be promptly and fully disclosed to the Company.  Without the Company being obligated to pay any consideration therefore in addition to the compensation Employee is to receive hereunder, any such invention, design, improvement, discovery, formula, method, creative work, copyright, or other intellectual property will be the sole and absolute property of the Company, and the Company will be the sole and

absolute owner of all copyright, trademark, service mark and other rights in respect thereof.  At the request of the Company, Employee will execute and deliver all such documents and will do all such other acts as may be in the Company's opinion necessary or desirable to secure to the Company or its nominee all rights, title and interest in and to any such invention, design, improvement, discovery, formula or method, including but not limited to applications for copyright or trademark issued by the United States or any other country.  The provisions of this paragraph shall be binding upon the heirs, successors, and assigns of Employee.

## 7.  COOPERATION

Employee agrees to cooperate both during Employee's employment hereunder and thereafter, to the extent and in the manner requested by the Company, in the prosecution or defense of any claims, litigation or other proceeding involving property of the Company, Confidential

4

Docusign Envelope ID: 6406485C-D2D4-4407-9162-C506643132BF





Information or Trade Secrets.

**Initial**

## 8. TERMINATION

**(A)** The parties agree that the employment relationship between Employee and the Company is terminable at will as provided under Georgia law, i.e., either party may terminate the employment relationship between the parties for any reason or no reason at any time without giving prior notice to the other party.  Notwithstanding any other provision of this Agreement, no provision of this Agreement is intended to create, nor shall be construed to create a contract of employment for any specific term, or to modify in any way the right of either party to terminate the employment relationship between the parties for any reason and at any time without giving prior notice to the other party.

**(B)** Notwithstanding any provision to the contrary, regardless of the termination of this Agreement at any time, the provisions of Sections 4, 5, 6, 7, 8, 9 and 10 inclusive shall remain in full force and effect.

## 9.  AGREEMENT NOT TO SOLICIT BUSINESS OR EMPLOYEES

(A) <u>Non-Solicitation of Clients</u>.  During Employee's employment and for a period of one (1) year thereafter, Employee covenants and agrees that Employee shall not solicit, or attempt to solicit, any of the Company's clients, including actively sought prospective clients, with whom

(B) Employee had "material contact" during Employee's employment, for the purpose of providing products or services competitive with those provided by the Company. "Material Contact" exists between Employee and each customer or potential customer: (i) with whom Employee has dealt in an effort to further the business relationship within the twelve (12) months immediately prior to the last day worked; or (ii) whose dealings with Company were coordinated or supervised by Employee.

**(C)** <u>Non-Solicitation of Employees</u>.  Employee agrees that, during the term of this Agreement and for a period of two (2) years after the termination of this Agreement, Employee shall not, directly or indirectly, on Employee's own behalf or on behalf of any person or other entity, solicit or induce, or attempt to solicit or induce any person who is an employee of the Company to terminate such person's employment with the Company, whether expressed in a written or oral agreement or understanding or otherwise.

## 10. AGREEMENT NOT TO PERFORM POST-EMPLOYMENT WORK FOR THE COMPANY'S CLIENTS WITHOUT PRIOR PERMISSION

Employee agrees that, without the written consent of the President of the Company, and for a period of one (1) year after Employee's employment with the Company, Employee will not,

5



Initial

*Jk*

directly, or indirectly, perform work for any person or entity that was a client or customer of the Company during the time that Employee was employed by the Company. Employee acknowledges that this means that, without such written consent, and during such period following termination of Employee's employment relationship with the Company, Employee will not work for or be involved in the business of any such client or customer of the Company in an executive, managerial, marketing, sales, technical, administrative, or product development capacity, whether as an owner, principal, partner, employee, consultant, contractor, agent or representative.

## 11. SEVERABILITY

The covenants of Employee set forth in Sections 4, 5, 6, 7, 8, 9 and 10 are of the essence of this Agreement. Each of such covenants shall be deemed and shall be construed as a separate and independent covenant and should any part or provision of any such covenants be reformed or declared invalid by any court of competent jurisdiction, such reformation or invalidity shall in no way render invalid or unenforceable any other part or provision thereof or any other separate covenant of Employee not declared invalid. Further the parties are in agreement that the restrictive covenants contained in this agreement are reasonably necessary for the protection of the interests of the Company.

## 12. NOTICES

Any notice required or permitted to be given to one party by the other party hereto pursuant to this Agreement shall be in writing and shall be personally delivered or sent by United States Mail, certified or registered, return receipt requested, first-class postage and charges prepaid, in envelopes addressed to the parties as follows:

<u>Employee:</u>    Jonathan Kozell
1853 Grove
Highland, MI 48356


<u>Company:</u>    Global Systems Integration, Inc.
Attention: Kevin R. Herrig
3760 Sixes Road
Suite 126, PMB 240
Canton, Georgia 30114-8195

<u>With a Copy to:</u>    Clarence M. Belnavis
Fisher & Phillips LLP
111 SW Fifth Avenue, Suite 4040
Portland, OR 97204

6

Docusign Envelope ID: 6406485C-D2D4-4407-9162-C506643132BF





or at such other addresses as shall be designated in writing as aforesaid by either party to the other party hereto.  Notices delivered in person shall be effective on the date of delivery. Notices sent by United States Mail shall be effective upon the date of actual receipt.

## 13. ASSIGNMENT

The assignment by Employee of this Agreement or any interest herein, or of any money due or to become due by reason of the terms hereof, without the prior written consent of the Company, shall be void.

## 14. OTHER RIGHTS; AMENDMENTS

The rights of the Company under this Agreement to protect its Confidential Information, Trade Secrets, business records and other proprietary interests are in addition to, and not in lieu of, all other rights the Company may have at law or in equity to protect its confidential information, trade secrets and other proprietary interests.  No amendment or modification of this Agreement shall be valid or binding upon the parties unless made in writing and signed by both Employee and by the President of the Company.

## 15. WAIVER

(a)     The waiver by one party of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach of the same or any other provision by the other party.

(b)     The existence of any claim, demand, action or cause of action of Employee against the Company, whether predicated upon this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of any of the covenants contained herein but may be asserted by way of counterclaim or other litigation as a separate claim for damages.

## 16. SURVIVAL

The obligation of the Company to pay any amounts to Employee remaining unpaid at the date of termination of this Agreement and the covenants of Employee contained in Sections 4, 5, 6, 7, 8 and 9 shall survive the termination of this Agreement and the Employee's employment and shall not be extinguished thereby.

## 17. CHOICE OF LAW

This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Georgia, and the parties do hereby agree to submit to the jurisdiction and venue of a

Docusign Envelope ID: 6406485C-D2D4-4407-9162-C506643132BF



court of competent jurisdiction within the State of Georgia, the state in which the Company was incorporated, and which has been from its inception and remains its principal place of business. Further, the parties disclaim any contention that may subsequently be made, and agree not to contend in the future, that courts of competent jurisdiction within the State of Georgia are not legally proper and convenient forums in which to resolve any and all disputes that may arise concerning the interpretation and/or enforcement of this Agreement; and the parties are in agreement that there are sufficient business contacts with the State of Georgia to support the parties' desire to resolve any disputes under this Agreement within the jurisdiction of the Georgia courts, such that Employee will, in the event of such a dispute that proceeds to litigation, be subject to the personal jurisdiction and venue of a court of competent jurisdiction in the state of Georgia.

## 18. OTHER AGREEMENTS; AMENDMENTS

This Employment Agreement embodies the entire agreement of the parties as to the subject matter contained herein and all prior discussions, representations, promises, statements, offers, or agreements, whether verbal or written, regarding the subject matter of this Agreement are hereby superseded and revoked.  This Agreement may only be amended in a writing of equal or greater dignity which is executed by the party against whom enforcement is sought, and, in the case of the Company, by the President of the Company.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and have affixed their seals as of the date first above written.

GLOBAL SYSTEMS INTEGRATION, INC.                ACCEPTED AND AGREED BY
                                                  EMPLOYEE

By: _____                   _____
    18A06091DD8B44D...                           3B6C384DA394428...
Title: President                                

Date: September 30, 2024                        Date: September 30, 2024

**U.S. Postal Service™**   2-10-26   CM 37944   .0002

**CERTIFIED MAIL® RECEIPT**

*Domestic Mail Only*   Cyndi

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee

$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)   $ _____
☐ Return Receipt (electronic)   $ _____
☐ Certified Mail Restricted Delivery   $ _____
☐ Adult Signature Required   $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage

$

**Total Postage and Fees**

$

Sent To   JONATHAN KOZELL

Street and Apt. No., or PO Box No.   1853 GROVE

City, State, ZIP+4®   Highland, MI 48356

PS Form 3800, April 2015 PSN 7530-02-000-9047   **See Reverse for Instructions**

---

**U.S. Postal Service™**   CM 37944.0002

**CERTIFIED MAIL® RECEIPT**

*Domestic Mail Only*   Cyndi   2/10/26

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee

$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)   $ _____
☐ Return Receipt (electronic)   $ _____
☐ Certified Mail Restricted Delivery   $ _____
☐ Adult Signature Required   $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage

$

**Total Postage and Fees**

$

Sent To   RYAN FAST

Street and Apt. No., or PO Box No.   5215 WEST MAPLE ROAD

City, State, ZIP+4®   WEST BLOOMFIELD MI 48322

PS Form 3800, April 2015 PSN 7530-02-000-9047   **See Reverse for Instructions**

# Exhibit B



fisherphillips.com

**Seattle**
1700 Seventh Avenue
Suite 2200
Seattle, WA 98101-4416

(206) 682-2308 Tel
(206) 682-7908 Fax

**Writer's Direct Dial:**
(206) 693-5075
**Writer's E-mail:**
cbelnavis@fisherphillips.com

February 10, 2026

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**AND**
**FIRST-CLASS MAIL**

Ryan Fast
5215 West Maple Road
West Bloomfield Township, MI 48322

   Re: *Your Legal Obligations Under Your Prior Employment Agreement*

Dear Mr. Fast:

This firm represents Global Systems Integration, Inc. ("GSI" or the "Company"). Please direct future communications to me.

I am writing because it has come to GSI's attention that you may have wrongfully solicited GSI employees to join a competitor company (Switchback Advisors, Inc.), may be using GSI's confidential business information and trade secrets, are unfairly competing with the Company through the use of confidential business information, and/or otherwise breached several obligations under the terms of your Employment Agreement ("Agreement") that you signed on or about January 27, 2022. (A copy of the Agreement is attached.) As a result, the Company will hold you (and any of your associates who have similar obligations) liable for any contractual breaches, tortious interference with business expectancies, misappropriation of trade secrets, and any other potential claims.

I am writing to demand that you **immediately cease and desist** from unfairly competing with GSI and its products, processes, or services; using any of the Company's confidential information and trade secrets; soliciting employees and customers of the Company; and further violating the obligations set forth in the enclosed Agreement. I am further writing to inform you that GSI has instructed me to take all necessary action to protect its rights and interests.

**Fisher & Phillips LLP**

Atlanta · Baltimore · Boston · Charlotte · Chicago · Cleveland · Columbia · Columbus · Dallas · Denver · Detroit · Fort Lauderdale · Gulfport · Houston
Irvine · Kansas City · Las Vegas · Los Angeles · Louisville · McLean · Memphis · Minneapolis · Nashville · New Jersey · New Orleans · New York · Orlando
Philadelphia · Phoenix · Pittsburgh · Portland · Sacramento · San Diego · San Francisco · Seattle · Tampa · Washington, DC · Woodland Hills

Ryan Fast
February 10, 2026
Page 2

### *Your Obligation Not to Solicit Business or Employees*

You made a promise to the Company that you would not solicit any of your coworkers to leave GSI or any customers/clients to move their business from GSI:

> 9. AGREEMENT NOT TO SOLICIT BUSINESS OR EMPLOYEES
>
> (A)   Non-Solicitation of Clients.  During Employee's employment and for a period of one (1) year thereafter, Employee covenants and agrees that Employee shall not solicit, or attempt to solicit, any of the Company's clients, including actively sought prospective clients, with whom Employee had "material contact" during Employee's employment, for the purpose of providing products or services competitive with those provided by the Company.   "Material Contact" exists between Employee and each customer or potential customer: (i) with whom Employee has dealt in an effort to further the business relationship within the twelve (12) months immediately prior to the last day worked; or (ii) whose dealings with Company were coordinated or supervised by Employee.
>
> (B)   Non-Solicitation of Employees.  Employee agrees that, during the term of this Agreement and for a period of two (2) years after the termination of this Agreement, Employee shall not, directly or indirectly, on Employee's own behalf or on behalf of any person or other entity, solicit or induce, or attempt to solicit or induce any person who is an employee of the Company to terminate such person's employment with the Company, whether expressed in a written or oral agreement or understanding or otherwise.

Thus, consistent with the Agreement, you cannot "solicit, or attempt to solicit, any of the Company's clients, including actively sought prospective clients" for a period of one year after the separation of employment, May 30, 2026. The ban prohibiting the solicitation of your coworkers exists for two years after separation, May 30, 2027.

In your position at Switchback Advisors, Inc., you are competing against the Company by engaging with other businesses in NetSuite Consultant Services. This is a direct violation of the restrictive covenants noted above. As such you are personally liable for any loss of business and related damages suffered by GSI.

### *Your Obligation to Return and Not to Use or Disclose Confidential Information*

While working for GSI, you had significant and direct access to and worked with confidential, proprietary, and trade secret information, including confidential information relating to the Company's customers and business. Section 5 of the Agreement contains your acknowledgment that it is important to maintain the secrecy and security of the Company's trade secrets:

Ryan Fast
February 10, 2026
Page 3

## 5. TRADE SECRETS

Employee covenants and agrees that Employee will treat as confidential and will not use (other than in the performance of Employee's designated duties to the Company) or disclose in any manner either during the term of Employee's association with the Company hereunder any Trade Secrets  Employee also agrees that during Employee's association with the Company as defined hereunder, Employee will use Employee's best efforts to protect any such Trade Secrets against loss by inadvertent or unauthorized disclosure and will comply with regulations established by the Company for the purpose of protecting such information.

Moreover, Section 1(C) of the Agreement broadly defines Confidential Information:

(C)     The term "Confidential Information" as used herein means information disclosed to, acquired or learned by the Employee as a consequence of his employment by the Company and not generally known to or by Competing Business (as defined in Section 1 (D) hereof) about the Business of the Company or the Company's financial affairs, including, without limitation, (1) information relating to research, development, inventions, accounting, marketing, clients, all information of the foregoing type relating to any client of the Company, client lists, client account records, training and operations material and memoranda, personnel records, clients' business in general, (2) the identity of customers and prospects, their specific requirements, and the names, addresses and telephone numbers of individual contacts; (3) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals; (4) pricing policies, methods of delivering services and products, marketing and sales strategies, product know-how, product technology and product development strategies; (5) physical security systems, access control systems, network and other equipment designs; (6) employment and payroll records; (7) forecasts, budgets and other non-public financial information; (8) product performance information, product technical information and product know-how; and (9) expansion plans, management policies and other business strategies and policies, and (10) and any other information treated by the Company as being confidential or labeled "Confidential," as well as all physical embodiments of any of the foregoing, all of which are hereby agreed to be the property of and confidential to the Company.

Per Section 4 of the Agreement, you entered into a covenant to "treat as confidential and * * * not, without the prior written approval of the Company, use (other than in the performance of Employee's designated duties to the Company), or disclose in any manner any Confidential Information * * *."

Moreover, Michigan law prohibits misappropriation or misuse of trade secret information, including disclosure or use of a trade secret of another without express or implied consent. MCL 445.1902(b); 445.1903-.1904. Other states and courts do the same. *See Retirement Group v. Galante,* 176 Cal. App. 4th 1226, 1238 (2009) (noting that a court may enjoin a former employee "from using trade secret information to identify existing customers, to facilitate the solicitation of such customers, or to otherwise unfairly compete with the former employer").

GSI understands that, in your present position at Switchback Advisors, Inc., you and several former GSI employees are using GSI's customer data, customer preferences and other trade secrets to provide services to your current employer. This misappropriation, removal, use,

FP 61646146.1

Ryan Fast
February 10, 2026
Page 4

or disclosure of GSI's proprietary or confidential business information for the benefit of a competitor violates the provisions of your Agreement and the Uniform Trade Secrets Act, 1998 PA 448 (MCL 445.1901-.1910). This Act imposes liability in addition to, and separate from, your contractual obligations not to unfairly compete with the Company.

### *Demands and Requested Assurances*

We insist that you abide by all your obligations to the Company, including those outlined above. GSI will vigorously protect its Confidential Information, trade secrets, and property, in addition to preventing any unfair competition and the solicitation of its employees and customers. GSI is fully prepared to defend its rights should you choose to breach these obligations in any way.

Accordingly, GSI demands that you take the following actions:

1.    Immediately purge from your possession and return to me as GSI's representative all Confidential Information (as defined in your Agreement) in your possession relating to the Company's business or its customers and provide me with a written assurance confirming that you have done so. In the event that you have any Confidential Information stored on your personal mobile phone, portable electronic device, computer, or in any other electronic format, GSI demands that you immediately (a) cease using or accessing such information; (b) not allow any third party to use or access it; (c) ensure that such information is preserved and is not deleted or altered in any way; and (d) notify me so that arrangements may be made to remove such data without destroying it or altering its integrity as potential evidence.

2.    Immediately cease and desist from using or disclosing all Confidential Information and provide me with written assurance confirming that you will refrain from such use and disclosure.

3.    Provide me with a list of all third parties to whom you have disclosed any Confidential Information so that we may work to remedy such disclosures.

4.    Provide me with a list of every Company customer or client, current or prospective, with whom you have communicated in any way following your departure from the Company, as well as the details of the method of each such communication (i.e., mailing, phone call, email, text message, etc.).

5.    Immediately take steps necessary to ensure that any and all documents related to the matters addressed herein (including with regard to demand #1) are preserved and not deleted or altered in any way so that they will be available as evidence **(this demand is imperative; you must not destroy any evidence related to the matters addressed in this letter)** and provide a written assurance confirming that you have done so. Specifically, you should take appropriate steps to preserve all paper, electronic, or other records, including but not limited to, emails, text messages, or other communications, that relate in any way to: (i) the

FP 61646146.1

Ryan Fast
February 10, 2026
Page 5

Company; (ii) your consideration and acceptance of employment with any new employer; (iii) the Company's customers; and (iv) any use or disclosure of the Company's Confidential Information, trade secrets, or property. This preservation obligation extends to any and all hard copy documents and electronic storage devices, including computers, smart phones, tablets, USB drives, and other devices, as well as emails, instant messages, documents, or other records stored in the cloud or on third-party devices, including LinkedIn, Gmail, Yahoo, iCloud, Slack, Teams, or other third-party email or messaging services.

6.     Provide written confirmation that you intend to honor all the contractual obligations found in the Agreement.

7.     Provide written confirmation that you will not solicit, recruit, or otherwise interfere with GSI's employees.

We demand that you make these written assurances by **5:00 p.m. on February 20, 2026**. It is further requested that you immediately contact me or have your counsel contact me to discuss whether there is any possibility to avoid litigation. Nothing contained in or omitted from this letter is or shall be deemed a limitation, restriction, or waiver of any rights or remedies, either at law or in equity, in connection with any of the matters raised in this letter, all of which are expressly reserved.

**This matter involves important legal issues, and you may wish to contact an attorney**. We look forward to your cooperation. Please contact me directly if you have any questions about this matter.

Sincerely,

Clarence M. Belnavis
For FISHER & PHILLIPS LLP

Enclosure: as stated
CMAB:cmc

FP 61646146.1

## McClintock, Cyndi

| | |
|---|---|
| **From:** | McClintock, Cyndi |
| **Sent:** | Wednesday, February 11, 2026 4:48 PM |
| **To:** | rfast87@gmail.com |
| **Cc:** | Belnavis, Clarence; McClintock, Cyndi |
| **Subject:** | Global Systems Integration, Inc. - Cease and Desist |
| **Attachments:** | 2026.02.10 Cease and Desist Letter to Ryan Fast.pdf; SIGNED Employee Agreement - Ryan Fast.pdf |

**Sent on behalf of Clarence Belnavis**

Dear Mr. Fast,

Please see the attached correspondence from Clarence Belnavis together with the enclosure referenced therein.  The letter and enclosure were sent to you by first-class mail and certified mail on February 10, 2026.

We look forward to your response.

Thank you,
Cyndi McClintock



**Cyndi McClintock**
**Legal Secretary**
Fisher & Phillips LLP
560 SW Tenth Avenue | Suite 450 | Portland, OR 97205
cmcclintock@fisherphillips.com
O: (503) 205-8067

<div style="border:1px solid #ccc; padding:4px; display:inline-block;">Website</div>

*This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error, then immediately delete this message.*

RF

## EMPLOYMENT AGREEMENT

THIS AGREEMENT entered into as of this 26th day of January 2022, between GLOBAL SYSTEMS INTEGRATION, INC., a Georgia corporation (hereinafter called the "Company"), and Ryan Fast (hereinafter called "Employee").

## W I T N E S S E T H:

WHEREAS the Company desires to employ Employee and Employee desires to accept employment on the terms and conditions hereinafter stated; and

WHEREAS, in the course of Employee's employment, Employee will, in carrying out Employee 's unique services to the Company, have access to corporate planning material and confidential employment material and will gain knowledge of confidential information relating to the business, affairs, clients and methods of the Company and its clients, and techniques in the provision of the Company's services through the use of systems, forms and methods used and devised by the Company or at the Company's expense, will have access to lists of the Company's clients and their needs, and will become personally known to and acquainted with the Company's clients; and

WHEREAS the Company would suffer irreparable harm if Employee were to use such knowledge, information and personal relationships in competition with the Company.

NOW, THEREFORE, in consideration of the employment of Employee by Company, the promises and mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt, adequacy and sufficiency of which is hereby acknowledged by the parties, and the intent of both parties to be legally bound by the terms of this agreement throughout the term of Employee's employment with Company, and thereafter as provided herein, the parties agree as follows:

## 1. DEFINITIONS

(A)     The term "Business" as used herein means sales, pre-sales, and/or consulting with regards to Oracle's JD Edwards OneWorld® / EnterpriseOne® software and supporting technologies, Oracle's E-Business Suite software and supporting technologies, and Oracle's Enterprise software and supporting technologies.

(B)     The term "Trade Secrets" as used herein includes, without limitation, the whole or any part or phase of any scientific or technical information, design, process, procedure, improvement, invention, plan, technique of production or service, or method or system which is used by and known only to the Company and Company's clients and to those of its employees and independent contractors to whom it has been confided in order to achieve its intended use. "Trade Secrets" also include all other property, things or information which would be considered trade secrets under the Georgia Trade Secrets Act or under any amendments thereto, and other applicable law which Act, Amendments and other applicable law, if any, are specifically incorporated herein by reference and made a part hereof.

1



(C)     The term "Confidential Information" as used herein means information disclosed to, acquired or learned by the Employee as a consequence of his employment by the Company and not generally known to or by Competing Business (as defined in Section 1 (D) hereof) about the Business of the Company or the Company's financial affairs, including, without limitation, (1) information relating to research, development, inventions, accounting, marketing, clients, all information of the foregoing type relating to any client of the Company, client lists, client account records, training and operations material and memoranda, personnel records, clients' business in general, (2) the identity of customers and prospects, their specific requirements, and the names, addresses and telephone numbers of individual contacts; (3) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals; (4) pricing policies, methods of delivering services and products, marketing and sales strategies, product know-how, product technology and product development strategies; (5) physical security systems, access control systems, network and other equipment designs; (6) employment and payroll records; (7) forecasts, budgets and other non-public financial information; (8) product performance information, product technical information and product know-how; and (9) expansion plans, management policies and other business strategies and policies, and (10) and any other information treated by the Company as being confidential or labeled "Confidential," as well as all physical embodiments of any of the foregoing, all of which are hereby agreed to be the property of and confidential to the Company.

(D)     The term "Competing Business" as used herein means any person, concern or entity which is engaged in or conducts a business substantially similar to the Business.

## 2. TERM AND DUTIES

(A)     Employee shall use Employee's best efforts to perform Employee's duties in a manner which is in the best interest of the Company.  Employee's responsibilities shall include computer systems consulting and such other duties consistent with his position with the Company as may from time to time be assigned to Employee by the President of the Company.

(B)     For so long as Employee is employed by the Company, Employee agrees

(i)     to devote all Employee's time, energy, and skill during business hours to the performance of the duties of Employee's employment and as otherwise requested by the Company (vacations and reasonable absences due to illness excepted), and

(ii)     not to engage directly or indirectly in any active work (other than pursuant to this Agreement) without the prior written consent of the President or such other person as the Executives of the Company shall designate from time to time.

(iii)     not to engage in any activities whatsoever that are in competition with the Company, or which are in any way detrimental to or in conflict with the business interests of the Company.

DocuSign Envelope ID: 0F9D2051-7C26-449E-8C66-88EFFFF874AAA

(C)　　All funds and property received by Employee on behalf of the Company shall be received and held by Employee in Employee's capacity as an employee of the Company, and the Employee shall account for and remit all such funds to the Company.

## 3.  CONFIDENTIALITY OF EMPLOYMENT AGREEMENT

The contents and terms of this Agreement are confidential, and Employee agrees not to disclose nor discuss the terms of this Agreement with anyone, including but not limited to, any of the Company's other employees, clients, business associates, competitors or any other party other than Employee's legal counsel.  Any violation of this provision shall constitute breach of contract and shall subject Employee to the default provisions of this Agreement.

## 4. CONFIDENTIAL INFORMATION

Employee acknowledges that the Company is in a highly competitive industry and that during Employee's employment with the Company, Employee will have access to, receive, learn develop and/or conceive technical customer, prospect, financial or other information that is proprietary and confidential to the Company that must be kept in strict confident to protect the Company's business and maintain its competitive position in the marketplace.  Employees also is aware and acknowledges that such information would be useful to the Company's existing and potential competitors, for indefinite periods of time, and that possession of such information by clients or customers of the Company would be detrimental to the interests of the Company, such that the Company would be irreparably harmed by Employee's subsequent employment, following termination of the employment relationship between the parties, by a competitor of the Company, or by a customer or client of the Company, due to the likelihood or possibility that there would be inadvertent or other disclosures of the Company's proprietary and confidential information or that there would be improper or inappropriate interference with its valuable customer relationships.  Employee therefore covenants and agrees that Employee will treat as confidential and will not, without the prior written approval of the Company, use (other than in the performance of Employee's designated duties to the Company), or disclose in any manner any Confidential Information, other than as necessary for the performance by Employee under this Agreement, and other than information which is a matter of public knowledge through no fault of Employee or which has heretofore been or is hereafter published in any publication for public distribution or filed as public information with a governmental authority.  Employee also agrees that during Employee's employment with the Company as described hereunder, Employee will use Employee's best efforts to protect any such Confidential Information against loss by inadvertent or unauthorized disclosure and will comply with any regulations established by the Company for the purpose of protecting such information.

## 5. TRADE SECRETS

Employee covenants and agrees that Employee will treat as confidential and will not use (other than in the performance of Employee's designated duties to the Company) or disclose in any manner either during the term of Employee's association with the Company hereunder any Trade Secrets Employee also agrees that during Employee's association with the Company as defined hereunder,

3

Employee will use Employee's best efforts to protect any such Trade Secrets against loss by inadvertent or unauthorized disclosure and will comply with regulations established by the Company for the purpose of protecting such information.

## 6. RECORDS AND EMPLOYEE INVENTIONS

(A)    All records, notes, files, memoranda, reports, price lists, client lists, media lists, drawings, plans, sketches, documents, equipment, apparatus and like items, and all copies thereof, relating to the Business of the Company, Confidential Information or Trade Secrets, which shall be prepared by Employee or which shall be disclosed to or which shall come into the possession of Employee, shall be and remain the sole and exclusive property of the Company.  Employee agrees that upon the termination of his employment by the Company, or at any other time upon request, Employee will promptly deliver to the Company the originals and all copies of any of the foregoing that are in Employee's possession, custody or control, and any other property belonging to the Company.

(B)    Any invention, design, improvement, discovery, formula, method, creative work, copyright or other intellectual property relating to or useful in connection with any business conducted by the Company, now or in the future, which is made or discovered or which comes to the attention of the Employee while employed by the Company will be promptly and fully disclosed to the Company. Without the Company being obligated to pay any consideration therefore in addition to the compensation Employee is to receive hereunder, any such invention, design, improvement, discovery, formula, method, creative work, copyright, or other intellectual property will be the sole and absolute property of the Company, and the Company will be the sole and absolute owner of all copyright, trademark, service mark and other rights in respect thereof.  At the request of the Company, Employee will execute and deliver all such documents and will do all such other acts as may be in the Company's opinion necessary or desirable to secure to the Company or its nominee all rights, title and interest in and to any such invention, design, improvement, discovery, formula or method, including but not limited to applications for copyright or trademark issued by the United States or any other country. The provisions of this paragraph shall be binding upon the heirs, successors, and assigns of Employee.

In furtherance of compliance with this Section 6, Employee herewith grants to the Company a Power of Attorney, coupled with an interest, empowering the Company to execute and deliver any and all documents necessary to effectuate the provisions of Section 6 (B).

## 7. COOPERATION

Employee agrees to cooperate both during Employee's employment hereunder and thereafter, to the extent and in the manner requested by the Company, in the prosecution or defense of any claims, litigation or other proceeding involving property of the Company, Confidential Information or Trade Secrets.

4

## 8. TERMINATION

**(A)**     The parties agree that the employment relationship between Employee and the Company is terminable at will as provided under Georgia law, i.e., either party may terminate the employment relationship between the parties for any reason or no reason at any time without giving prior notice to the other party.  Notwithstanding any other provision of this Agreement, no provision of this Agreement is not intended to create, nor shall be construed to create a contract of employment for any specific term, or to modify in any way the right of either party to terminate the employment relationship between the parties for any reason and at any time without giving prior notice to the other party.

(B)     Notwithstanding any provision to the contrary, regardless of the termination of this Agreement at any time, the provisions of Sections 4, 5, 6, 7, 8, 9 and 10 inclusive shall remain in full force and effect.

## 9.  AGREEMENT NOT TO SOLICIT BUSINESS OR EMPLOYEES

(A)     Non-Solicitation of Clients.  During Employee's employment and for a period of one (1) year thereafter, Employee covenants and agrees that Employee shall not solicit, or attempt to solicit, any of the Company's clients, including actively sought prospective clients, with whom Employee had "material contact" during Employee's employment, for the purpose of providing products or services competitive with those provided by the Company.   "Material Contact" exists between Employee and each customer or potential customer: (i) with whom Employee has dealt in an effort to further the business relationship within the twelve (12) months immediately prior to the last day worked; or (ii) whose dealings with Company were coordinated or supervised by Employee.

**(B)**     Non-Solicitation of Employees.  Employee agrees that, during the term of this Agreement and for a period of two (2) years after the termination of this Agreement, Employee shall not, directly or indirectly, on Employee's own behalf or on behalf of any person or other entity, solicit or induce, or attempt to solicit or induce any person who is an employee of the Company to terminate such person's employment with the Company, whether expressed in a written or oral agreement or understanding or otherwise.

## 10. AGREEMENT NOT TO PERFORM POST-EMPLOYMENT
## WORK FOR THE COMPANY'S CLIENTS WITHOUT PRIOR PERMISSION

Employee agrees that, without the written consent of the President of the Company, and for a period of one (1) year after Employee's employment with the Company, Employee will not, directly, or indirectly, perform work for any person or entity that was a client or customer of the Company during the time that Employee was employed by the Company.  Employee acknowledges that this means that, without such written consent, and during such period following termination of Employee's employment relationship with the Company, Employee will not work for or be involved in the business of any such client or customer of the Company in an executive, managerial, marketing, sales, technical, administrative, or product development capacity, whether as an owner, principal, partner, employee, consultant, contractor, agent or representative.

5

RF

## 11. SEVERABILITY

The covenants of Employee set forth in Sections 4, 5, 6, 7, 8, 9 and 10 are of the essence of this Agreement.  Each of such covenants shall be deemed and shall be construed as a separate and independent covenant and should any part or provision of any such covenants be reformed or declared invalid by any court of competent jurisdiction, such reformation or invalidity shall in no way render invalid or unenforceable any other part or provision thereof or any other separate covenant of Employee not declared invalid. Further the parties are in agreement that the restrictive covenants contained in this agreement are reasonably necessary for the protection of the interests of the Company; nevertheless, should any court find any such provision(s) of this agreement to unlawfully overbroad or restrictive, it is the intent of the parties that that such court shall its nevertheless enforce the restrictive covenant(s) of this Agreement to the extent such restrictions are necessary for the protection of the legitimate interests of the Company.

## 12. NOTICES

Any notice required or permitted to be given to one party by the other party hereto pursuant to this Agreement shall be in writing and shall be personally delivered or sent by United States Mail, certified or registered, return receipt requested, first-class postage and charges prepaid, in envelopes addressed to the parties as follows:

| Employee: | Ryan Fast |
| | 5215 W. Maple Rd. |
| | West Bloomfield Township, MI 48322 |

| Company: | Global Systems Integration, Inc. |
| | Attention:  Kevin R. Herrig |
| | 3760 Sixes Road |
| | Suite 126, PMB 240 |
| | Canton, Georgia 30114-8195 |

| With a Copy to: | C.R. Wright |
| | Fisher Phillips |
| | 1075 Peachtree St., N.E., Suite 3500 |
| | Atlanta, GA 30309 |

or at such other addresses as shall be designated in writing as aforesaid by either party to the other party hereto.  Notices delivered in person shall be effective on the date of delivery. Notices sent by United States Mail shall be effective upon the date of actual receipt.

## 13. ASSIGNMENT

6

The assignment by Employee of this Agreement or any interest herein, or of any money due or to become due by reason of the terms hereof, without the prior written consent of the Company, shall be void.

## 14. OTHER RIGHTS; AMENDMENTS

The rights of the Company under this Agreement to protect its Confidential Information, Trade Secrets, business records and other proprietary interests are in addition to, and not in lieu of, all other rights the Company may have at law or in equity to protect its confidential information, trade secrets and other proprietary interests. No amendment or modification of this Agreement shall be valid or binding upon the parties unless made in writing and signed by both Employee and by the President of the Company.

## 15. WAIVER

(a)     The waiver by one party of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach of the same or any other provision by the other party.

(b)     The existence of any claim, demand, action or cause of action of Employee against the Company, whether predicated upon this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of any of the covenants contained herein but may be asserted by way of counterclaim or other litigation as a separate claim for damages.

## 16. SURVIVAL

The obligation of the Company to pay any amounts to Employee remaining unpaid at the date of termination of this Agreement and the covenants of Employee contained in Sections 4, 5, 6, 7, 8 and 9 shall survive the termination of this Agreement and the Employee's employment and shall not be extinguished thereby.

## 17. CHOICE OF LAW

This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Georgia, and the parties do hereby agree to submit to the jurisdiction and venue of a court of competent jurisdiction within the State of Georgia, the state in which the Company was incorporated, and which has been from its inception and remains its principal place of business. Further, the parties disclaim any contention that may subsequently be made, and agree not to contend in the future, that courts of competent jurisdiction within the State of Georgia are not legally proper and convenient forums in which to resolve any and all disputes that may arise concerning the interpretation and/or enforcement of this Agreement; and the parties are in agreement that there are sufficient business contacts with the State of Georgia to support the parties' desire to resolve any disputes under this Agreement within the jurisdiction of the Georgia courts, such that Employee will, in the event of such a dispute that proceeds to litigation, be subject to the personal jurisdiction and venue of a court of competent jurisdiction in the state of Georgia.

## 18. OTHER AGREEMENTS; AMENDMENTS

This Employment Agreement embodies the entire agreement of the parties as to the subject

7

matter contained herein and all prior discussions, representations, promises, statements, offers, or agreements, whether verbal or written, regarding the subject matter of this Agreement are hereby superseded and revoked.  This Agreement may only be amended in a writing of equal or greater dignity which is executed by the party against whom enforcement is sought, and, in the case of the Company, by the President of the Company.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and have affixed their seals as of the date first above written.

GLOBAL SYSTEMS INTEGRATION, INC.                    ACCEPTED AND AGREED BY
                                                                                        EMPLOYEE

By: _____                    _____
    18A06091DD8B44D...                                                      72B9BD8216FA469...

Title: President_____

Date: January 28, 2022, 20_____          Date: January 27, 2022, 20_____

8

**U.S. Postal Service™**
2-10-26 CM 37944 .0002
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only* CyuDi

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy) $ _____
☐ Return Receipt (electronic) $ _____
☐ Certified Mail Restricted Delivery $ _____
☐ Adult Signature Required $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage
$

Total Postage and Fees
$

Sent To JONATHAN KOZELL
Street and Apt. No., or PO Box No. 1853 GROVE
City, State, ZIP+4® Highland, MI 48356

PS Form 3800, April 2015 PSN 7530-02-000-9047 See Reverse for Instructions

---

**U.S. Postal Service™**
CM 37944.0002
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only* CyuDi 2/10/26

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy) $ _____
☐ Return Receipt (electronic) $ _____
☐ Certified Mail Restricted Delivery $ _____
☐ Adult Signature Required $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage
$

Total Postage and Fees
$

Sent To RYAN FAST
Street and Apt. No., or PO Box No. 5215 WEST MAPLE ROAD
City, State, ZIP+4® WEST BLOOMFIELD MI 48322

PS Form 3800, April 2015 PSN 7530-02-000-9047 See Reverse for Instructions

# Exhibit C

DocuSign Envelope ID: 4CFB0040-206E-4BB8-A978-68DCC902C62F





## EMPLOYMENT AGREEMENT

THIS AGREEMENT entered into as of this 27th day of November 2023, between GLOBAL SYSTEMS INTEGRATION, INC., a Georgia corporation (hereinafter called the "Company"), and Emerald Morgan (hereinafter called "Employee").

## W I T N E S S E T H:

WHEREAS the Company desires to employ Employee and Employee desires to accept employment on the terms and conditions hereinafter stated; and

WHEREAS, in the course of Employee's employment, Employee will, in carrying out Employee 's unique services to the Company, have access to corporate planning material and confidential employment material and will gain knowledge of confidential information relating to the business, affairs, clients and methods of the Company and its clients, and techniques in the provision of the Company's services through the use of systems, forms and methods used and devised by the Company or at the Company's expense, will have access to lists of the Company's clients and their needs, and will become personally known to and acquainted with the Company's clients; and

WHEREAS the Company would suffer irreparable harm if Employee were to use such knowledge, information and personal relationships in competition with the Company.

NOW, THEREFORE, in consideration of the employment of Employee by Company, the promises and mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt, adequacy and sufficiency of which is hereby acknowledged by the parties, and the intent of both parties to be legally bound by the terms of this agreement throughout the term of Employee's employment with Company, and thereafter as provided herein, the parties agree as follows:

## 1. DEFINITIONS

(A)     The term "Business" as used herein means sales, pre-sales, and/or consulting with regards to Oracle's JD Edwards OneWorld® / EnterpriseOne® software and supporting technologies, Oracle's E-Business Suite software and supporting technologies, and Oracle's Enterprise software and supporting technologies.

(B)     The term "Trade Secrets" as used herein includes, without limitation, the whole or any part or phase of any scientific or technical information, design, process, procedure, improvement, invention, plan, technique of production or service, or method or system which is used by and known only to the Company and Company's clients and to those of its employees and independent contractors to whom it has been confided in order to achieve its intended use. "Trade

Secrets" also include all other property, things or information which would be considered trade



secrets under the Georgia Trade Secrets Act or under any amendments thereto, and other applicable law which Act, Amendments and other applicable law, if any, are specifically incorporated herein by reference and made a part hereof.

(C)     The term "Confidential Information" as used herein means information disclosed to, acquired or learned by the Employee as a consequence of his employment by the Company and not generally known to or by Competing Business (as defined in Section 1 (D) hereof) about the Business of the Company or the Company's financial affairs, including, without limitation, (1) information relating to research, development, inventions, accounting, marketing, clients, all information of the foregoing type relating to any client of the Company, client lists, client account records, training and operations material and memoranda, personnel records, clients' business in general, (2) the identity of customers and prospects, their specific requirements, and the names, addresses and telephone numbers of individual contacts; (3) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals; (4) pricing policies, methods of delivering services and products, marketing and sales strategies, product know-how, product technology and product development strategies; (5) physical security systems, access control systems, network and other equipment designs; (6) employment and payroll records; (7) forecasts, budgets and other non-public financial information; (8) product performance information, product technical information and product know-how; and (9) expansion plans, management policies and other business strategies and policies, and (10) and any other information treated by the Company as being confidential or labeled "Confidential," as well as all physical embodiments of any of the foregoing, all of which are hereby agreed to be the property of and confidential to the Company.

(D)     The term "Competing Business" as used herein means any person, concern or entity which is engaged in or conducts a business substantially similar to the Business.


## 2. TERM AND DUTIES

(A)     Employee shall use Employee's best efforts to perform Employee's duties in a manner which is in the best interest of the Company.  Employee's responsibilities shall include computer systems consulting and such other duties consistent with his position with the Company as may from time to time be assigned to Employee by the President of the Company.

(B)     For so long as Employee is employed by the Company, Employee agrees

(i)     to devote all Employee's time, energy, and skill during business hours to the performance of the duties of Employee's employment and as otherwise requested by the Company (vacations and reasonable absences due to illness excepted), and

(ii)     not to engage directly or indirectly in any active work (other than pursuant to

this Agreement) without the prior written consent of the President or such other person as the Executives of the Company shall designate from time to time.

2

 

(iii)   not to engage in any activities whatsoever that are in competition with the Company, or which are in any way detrimental to or in conflict with the business interests of the Company.

(C)   All funds and property received by Employee on behalf of the Company shall be received and held by Employee in Employee's capacity as an employee of the Company, and the Employee shall account for and remit all such funds to the Company.

(D)   Any and all funds (commissions and/or royalties) Employee may still receive from previous engagements prior to employment with Company shall remain with Employee.  Company asserts no right or ownership in those funds.

## 3.  CONFIDENTIALITY OF EMPLOYMENT AGREEMENT

The contents and terms of this Agreement are confidential, and Employee agrees not to disclose nor discuss the terms of this Agreement with anyone, including but not limited to, any of the Company's other employees, clients, business associates, competitors or any other party other than Employee's legal counsel.  Any violation of this provision shall constitute breach of contract and shall subject Employee to the default provisions of this Agreement.

## 4. CONFIDENTIAL INFORMATION

Employee acknowledges that the Company is in a highly competitive industry and that during Employee's employment with the Company, Employee will have access to, receive, learn develop and/or conceive technical customer, prospect, financial or other information that is proprietary and confidential to the Company that must be kept in strict confident to protect the Company's business and maintain its competitive position in the marketplace.  Employees also is aware and acknowledges that such information would be useful to the Company's existing and potential competitors, for indefinite periods of time, and that possession of such information by clients or customers of the Company would be detrimental to the interests of the Company, Employee therefore covenants and agrees that Employee will treat as confidential and will not, without the prior written approval of the Company, use (other than in the performance of Employee's designated duties to the Company), or disclose in any manner any Confidential Information, other than as necessary for the performance by Employee under this Agreement, and

other than information which is a matter of public knowledge through no fault of Employee, or which has heretofore been or is hereafter published in any publication for public distribution or filed as public information with a governmental authority.  Employee also agrees that during Employee's employment with the Company as described hereunder, Employee will use Employee's best efforts to protect any such Confidential Information against loss by inadvertent or unauthorized disclosure and will comply with any regulations established by the Company for the purpose of protecting such information.

DocuSign Envelope ID: 4CFB0040-206E-4BB8-A978-68DCC902C62F




## 5. TRADE SECRETS

Employee covenants and agrees that Employee will treat as confidential and will not use (other than in the performance of Employee's designated duties to the Company) or disclose in any manner either during the term of Employee's association with the Company hereunder any Trade Secrets  Employee also agrees that during Employee's association with the Company as defined hereunder, Employee will use Employee's best efforts to protect any such Trade Secrets against loss by inadvertent or unauthorized disclosure and will comply with regulations established by the Company for the purpose of protecting such information.

## 6.  RECORDS AND EMPLOYEE INVENTIONS

(A)     All records, notes, files, memoranda, reports, price lists, client lists, media lists, drawings, plans, sketches, documents, equipment, apparatus and like items, and all copies thereof, relating to the Business of the Company, Confidential Information or Trade Secrets, which shall be prepared by Employee or which shall be disclosed to or which shall come into the possession of Employee, shall be and remain the sole and exclusive property of the Company.  Employee agrees that upon the termination of his employment by the Company, or at any other time upon request, Employee will promptly deliver to the Company the originals and all copies of any of the foregoing that are in Employee's possession, custody or control, and any other property belonging to the Company.

(B)     Any invention, design, improvement, discovery, formula, method, creative work, copyright or other intellectual property relating to or useful in connection with any business conducted by the Company, now or in the future, which is made or discovered or which comes to the attention of the Employee while employed by the Company will be promptly and fully disclosed to the Company.  Without the Company being obligated to pay any consideration therefore in addition to the compensation Employee is to receive hereunder, any such invention, design, improvement, discovery, formula, method, creative work, copyright, or other intellectual property will be the sole and absolute property of the Company, and the Company will be the sole and

absolute owner of all copyright, trademark, service mark and other rights in respect thereof.  At the request of the Company, Employee will execute and deliver all such documents and will do all such other acts as may be in the Company's opinion necessary or desirable to secure to the Company or its nominee all rights, title and interest in and to any such invention, design, improvement, discovery, formula or method, including but not limited to applications for copyright or trademark issued by the United States or any other country.  The provisions of this paragraph shall be binding upon the heirs, successors, and assigns of Employee.

## 7.  COOPERATION

Employee agrees to cooperate both during Employee's employment hereunder and thereafter, to the extent and in the manner requested by the Company, in the prosecution or defense of any claims, litigation or other proceeding involving property of the Company, Confidential

4

DocuSign Envelope ID: 4CFB0040-206E-4BB8-A978-68DCC902C62F





Information or Trade Secrets.

## 8. TERMINATION

**(A)**  The parties agree that the employment relationship between Employee and the Company is terminable at will as provided under Georgia law, i.e., either party may terminate the employment relationship between the parties for any reason or no reason at any time without giving prior notice to the other party.  Notwithstanding any other provision of this Agreement, no provision of this Agreement is intended to create, nor shall be construed to create a contract of employment for any specific term, or to modify in any way the right of either party to terminate the employment relationship between the parties for any reason and at any time without giving prior notice to the other party.

**(B)**  Notwithstanding any provision to the contrary, regardless of the termination of this Agreement at any time, the provisions of Sections 4, 5, 6, 7, 8, 9 and 10 inclusive shall remain in full force and effect.

## 9.  AGREEMENT NOT TO SOLICIT BUSINESS OR EMPLOYEES

(A)  <u>Non-Solicitation of Clients</u>.  During Employee's employment and for a period of one (1) year thereafter, Employee covenants and agrees that Employee shall not solicit, or attempt to solicit, any of the Company's clients, including actively sought prospective clients, with whom

(B)  Employee had "material contact" during Employee's employment, for the purpose of providing products or services competitive with those provided by the Company. "Material Contact" exists between Employee and each customer or potential customer: (i) with whom Employee has dealt in an effort to further the business relationship within the twelve (12) months immediately prior to the last day worked; or (ii) whose dealings with Company were coordinated or supervised by Employee.

**(C)**  <u>Non-Solicitation of Employees</u>.  Employee agrees that, during the term of this Agreement and for a period of two (2) years after the termination of this Agreement, Employee shall not, directly or indirectly, on Employee's own behalf or on behalf of any person or other entity, solicit or induce, or attempt to solicit or induce any person who is an employee of the Company to terminate such person's employment with the Company, whether expressed in a written or oral agreement or understanding or otherwise.

## 10. AGREEMENT NOT TO PERFORM POST-EMPLOYMENT WORK FOR THE COMPANY'S CLIENTS WITHOUT PRIOR PERMISSION

Employee agrees that, without the written consent of the President of the Company, and for a period of one (1) year after Employee's employment with the Company, Employee will not,

DocuSign Envelope ID: 4CFB0040-206E-4BB8-A078-68DCC902C62F



directly, or indirectly, perform work for any person or entity that was a client or customer of the Company during the time that Employee was employed by the Company.  Employee acknowledges that this means that, without such written consent, and during such period following termination of Employee's employment relationship with the Company, Employee will not work for or be involved in the business of any such client or customer of the Company in an executive, managerial, marketing, sales, technical, administrative, or product development capacity, whether as an owner, principal, partner, employee, consultant, contractor, agent or representative.

## 11. SEVERABILITY

The covenants of Employee set forth in Sections 4, 5, 6, 7, 8, 9 and 10 are of the essence of this Agreement.  Each of such covenants shall be deemed and shall be construed as a separate and independent covenant and should any part or provision of any such covenants be reformed or declared invalid by any court of competent jurisdiction, such reformation or invalidity shall in no way render invalid or unenforceable any other part or provision thereof or any other separate covenant of Employee not declared invalid. Further the parties are in agreement that the restrictive covenants contained in this agreement are reasonably necessary for the protection of the interests of the Company.

## 12. NOTICES

Any notice required or permitted to be given to one party by the other party hereto pursuant to this Agreement shall be in writing and shall be personally delivered or sent by United States Mail, certified or registered, return receipt requested, first-class postage and charges prepaid, in envelopes addressed to the parties as follows:

<u>Employee:</u>  Emerald Morgan
      69 Maplewood Court
      Acworth, GA 30101

<u>Company:</u>  Global Systems Integration, Inc.
      Attention:  Kevin R. Herrig
      3760 Sixes Road
      Suite 126, PMB 240
      Canton, Georgia 30114-8195

<u>With a Copy to:</u>  Clarence M. Belnavis
      Fisher & Phillips LLP
      111 SW Fifth Avenue, Suite 4040
      Portland, OR 97204





or at such other addresses as shall be designated in writing as aforesaid by either party to the other party hereto.  Notices delivered in person shall be effective on the date of delivery. Notices sent by United States Mail shall be effective upon the date of actual receipt.

## 13. ASSIGNMENT

The assignment by Employee of this Agreement or any interest herein, or of any money due or to become due by reason of the terms hereof, without the prior written consent of the Company, shall be void.

## 14. OTHER RIGHTS; AMENDMENTS

The rights of the Company under this Agreement to protect its Confidential Information, Trade Secrets, business records and other proprietary interests are in addition to, and not in lieu of, all other rights the Company may have at law or in equity to protect its confidential information, trade secrets and other proprietary interests.  No amendment or modification of this Agreement shall be valid or binding upon the parties unless made in writing and signed by both Employee and by the President of the Company.

## 15. WAIVER

(a)     The waiver by one party of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach of the same or any other provision by the other party.

(b)     The existence of any claim, demand, action or cause of action of Employee against the Company, whether predicated upon this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of any of the covenants contained herein but may be asserted by way of counterclaim or other litigation as a separate claim for damages.

## 16. SURVIVAL

The obligation of the Company to pay any amounts to Employee remaining unpaid at the date of termination of this Agreement and the covenants of Employee contained in Sections 4, 5, 6, 7, 8 and 9 shall survive the termination of this Agreement and the Employee's employment and shall not be extinguished thereby.

## 17. CHOICE OF LAW

This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Georgia, and the parties do hereby agree to submit to the jurisdiction and venue of a

court of competent jurisdiction within the State of Georgia, the state in which the Company was incorporated, and which has been from its inception and remains its principal place of business. Further, the parties disclaim any contention that may subsequently be made, and agree not to contend in the future, that courts of competent jurisdiction within the State of Georgia are not legally proper and convenient forums in which to resolve any and all disputes that may arise concerning the interpretation and/or enforcement of this Agreement; and the parties are in agreement that there are sufficient business contacts with the State of Georgia to support the parties' desire to resolve any disputes under this Agreement within the jurisdiction of the Georgia courts, such that Employee will, in the event of such a dispute that proceeds to litigation, be subject to the personal jurisdiction and venue of a court of competent jurisdiction in the state of Georgia.

## 18. OTHER AGREEMENTS; AMENDMENTS

This Employment Agreement embodies the entire agreement of the parties as to the subject matter contained herein and all prior discussions, representations, promises, statements, offers, or agreements, whether verbal or written, regarding the subject matter of this Agreement are hereby superseded and revoked. This Agreement may only be amended in a writing of equal or greater dignity which is executed by the party against whom enforcement is sought, and, in the case of the Company, by the President of the Company.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and have affixed their seals as of the date first above written.

GLOBAL SYSTEMS INTEGRATION, INC.    ACCEPTED AND AGREED BY
                                     EMPLOYEE

By: _____
18A06091DD8B44D...

Title: President _____

Date: November 30, 2023 _____

Date: November 27, 2023 _____
0269188E335046F...

8

# Exhibit D



**Fisher & Phillips LLP**

**Seattle**
1700 Seventh Avenue
Suite 2200
Seattle, WA 98101

(206) 682-2308 Tel
(206) 682-7908 Fax

**Writer's Direct Dial:**
(206) 693-5075

**Writer's E-mail:**
cbelnavis@fisherphillips.com

March 27, 2026

***By Certified Mail***
***Return Receipt Requested***
***and First-Class Mail***
***and Email*** (PKOUNTOURIOTIS@HOTMAIL.COM)

Perry Kountouriotis
1605 Ridge Road
Highland, MI 48356

**Re:     Your Legal Obligations Under Your Prior Employment Agreement**

Dear Mr. Kountouriotis:

This firm represents Global Systems Integration, Inc. ("GSI" or the "Company"). Please direct future communications to me.

I am writing because it has come to GSI's attention that you likely removed confidential business information and trade secret information. In doing so you would have violated the law and breached several obligations under the terms of your Employment Agreement ("Agreement") that you signed on or about January 25, 2022. (A copy of the Agreement is attached.) As such, the Company will hold you (and any of your associates who have similar obligations) liable for any contractual breaches, tortious interference with business expectancies, misappropriation of trade secrets, and any other potential claims.

I am writing to demand that you **immediately return the various documents that you removed from GSI immediately prior to your resignation from the Company** and cease any use of such information with/for any competitor of the Company. I further write to inform you that GSI has instructed me to take all necessary action to protect its rights and interests.

**Your Obligation to Return and Not to Use or Disclose Confidential Information**

While working for GSI, you had significant and direct access to and worked with confidential, proprietary, and trade secret information, including confidential information relating to the Company's customers and business. Section 6 of the Agreement contains your acknowledgement that it is important to maintain the secrecy and security of the Company's trade secrets:

FP 62815748.1

Perry Kountouriotis
March 27, 2026
Page 2

> 6.  **Confidentiality**.  Employee acknowledges that the Company currently possesses, will develop and will come into possession of information that is owned by or may be valuable to the Company and its customers.  Employee will not use, exploit, reveal, divulge or make known to any person, firm, corporation or entity, any information or materials supplied by the Company or its customers to Employee or otherwise learned by Employee during his engagement with the Company, including without limitation, accounting and financial information, customer lists and customer information, mailing lists, data bases, pricing, operating records, marketing strategies, processes, plans or other records, business practices and strategies, and commercial and other information or data, whether communicated in writing, orally, by observation or other sensory detection (individually and collectively, "Confidential Information").  The Confidential Information shall also include all letters, memoranda, notes, reports and other documents containing or referencing the Confidential Information, and all copies, reproductions and extracts thereof, prepared by Employee, the Company or its customers, employees or agents.

Moreover, Section 8 of the Agreement makes it clear that know-how or intellectual property you developed during your tenure with GSI belongs exclusively to the Company:

> 8.  **Work Product**.  During Employee's employment with the Company, Employee may develop or conceive, in whole or in part, alone or with others, plans, manuals, handbooks, inventions, discoveries, improvements, trade secrets, secret processes and any technology, know-how or intellectual property, which results from any work Employee may do for or at the request of the Company (collectively, "Work Product").  All such Work Product will be deemed "work for hire" in accordance with the U.S. Copyright Act and shall be the Company's exclusive property, whether or not developed or made during business hours or with the use of the Company's facilities, equipment, materials, or personnel.  Employee will promptly report all Work Product to the Company.  Employee will assist the Company as necessary in obtaining patents or other protections for such Work Product.

Moreover, Michigan law prohibits misappropriation or misuse of trade secret information, including disclosure or use of a trade secret of another without express or implied consent. MCL 445.1902(b); 445.1903-.1904. Other states and courts do the same. *See Retirement Group v. Galante,* 176 Cal. App. 4th 1226, 1238 (2009) (noting that a court may enjoin a former employee "from using trade secret information to identify existing customers, to facilitate the solicitation of such customers, or to otherwise unfairly compete with the former employer").

**Your Unauthorized Removal of GSI Confidential Business Information**

Along with Jonathan Kozell, you were a partner in a company called CGA, which was acquired by GSI in January 2022. When Jon Kozell subsequently left along with Ryan Fast and Emerald Morgan to Switchback, you initially stayed with GSI.

On January 5, 2026, you submitted your resignation, effective January 30, 2026. It appears that you then used the time between your resignation notice and the resignation date to remove and backup GSI's confidential business information. GSI's IT Department tracked your decision to turn off the auto sync in OneDrive. You then signed into GSI's system with a non-company device on January 9, 2026, at 11:37 a.m. using your work email address and then synced that device with OneDrive. You pulled down data to that new device, and the last activity on the new device occurred on January 10, 2026, at 6:28 a.m. You left a digital trail of your various

FP 62815748.1

Perry Kountouriotis
March 27, 2026
Page 3

activities:



\* \* \*



During this same time frame, you made a request to purchase your four-year-old GSI computer. That request was denied by HR. Donna McDermott from GSI specifically asked for the return of the laptop and provided a means for you to send it back:

FP 62815748.1

Perry Kountouriotis
March 27, 2026
Page 4



Furthermore, Section 9 the Agreement expressly provides that you had to return this equipment:

9.    Return of Company Property. All records, data, papers, notes, software, customer lists, files, keys, equipment, and books of the Company, including Confidential Information, are and shall remain the property of the Company. Upon termination of Employee's engagement with the Company, Employee shall return all such property, including all copies and reproductions thereof, to the Company. Additionally, Employee shall not delete any information from the Company's systems, laptops, desktops or other electronic devices and shall return all such equipment upon termination of Employee's engagement in the same state that it was in prior to termination.

The laptop, like the intellectual property that resides on it, does not belong to you, and your conduct likely amounts to conversion.

## Demands and Requested Assurances

We insist that you abide by all your obligations to the Company, including those outlined above. GSI will vigorously protect its confidential information, trade secrets, and property, in addition to preventing any unfair competition and the unlawful use of its confidential business information.

Accordingly, GSI demands that you take the following actions:

1.    Immediately return to me as GSI's representative all GSI's confidential business information in your possession and provide me with a written assurance confirming that you have done so. In the event that you have such information stored on your personal mobile phone, portable electronic device, computer, or in any other electronic format, GSI demands that you

FP 62815748.1

Perry Kountouriotis
March 27, 2026
Page 5

immediately (a) cease using or accessing such information; (b) not allow any third party to use or access it; (c) ensure that such information is preserved and is not deleted or altered in any way; and (d) notify me so that arrangements may be made to remove such data without destroying it or altering its integrity as potential evidence;

2. Immediately cease and desist from using or disclosing any of GSI's confidential business Information and provide me with written assurance confirming that you will refrain from such use and disclosure;

3. Provide me with a list of all third parties to whom you have disclosed any of GSI's confidential business information so that we may work to remedy such disclosures;

4. Immediately take steps necessary to ensure that any and all documents related to the matters addressed herein are preserved and not deleted or altered in any way so that they will be available as evidence **(this demand is imperative; you must not destroy any evidence related to the matters addressed in this letter)** and provide a written assurance confirming that you have done so. Specifically, you should take appropriate steps to preserve all paper, electronic, or other records, including but not limited to, emails, text messages, or other communications, that relate in any way to: (i) the Company; (ii) your consideration and acceptance of employment with any new employer; (iii) the Company's customers; and (iv) any use or disclosure of the Company's Confidential Information, trade secrets, or property. This preservation obligation extends to any and all hard copy documents and electronic storage devices, including computers, smart phones, tablets, USB drives, and other devices, as well as emails, instant messages, documents, or other records stored in the cloud or on third-party devices, including LinkedIn, Gmail, Yahoo, iCloud, Slack, Teams, or other third-party email or messaging services;

5. Provide written confirmation that you intend to honor all the contractual obligations found in the Agreement; and

6. Provide written confirmation that you will not solicit, recruit, or otherwise interfere with GSI's employees.

We demand that you make these written assurances by **5:00 p.m. on April 8, 2026**. It is further requested that you immediately contact me or have your counsel contact me to discuss whether there is any possibility of avoiding litigation. Nothing contained in or omitted from this letter is or shall be deemed a limitation, restriction, or waiver of any rights or remedies, either at law or in equity, in connection with any of the matters raised in this letter, all of which are expressly reserved.

FP 62815748.1

Perry Kountouriotis
March 27, 2026
Page 6

**This matter involves important legal issues, and you may wish to contact an attorney.** We look forward to your cooperation. Please contact me directly if you have any questions about this matter.

Sincerely,

Clarence M. Belnavis
For FISHER & PHILLIPS LLP

Enclosure: as stated
CMAB:cmc

FP 62815748.1

*Execution Version*

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made effective this 25th day of January, 2022 (the "Effective Date"), by and between GLOBAL SYSTEMS INTEGRATION, INC., a Georgia corporation (the "Company"), and PERRY KOUNTOURIOTIS, an individual resident of the State of Michigan ("Employee").

WHEREAS, the Company specializes in providing a broad spectrum of business, functional, and technical consulting and managed services for Oracle JD Edwards, Oracle NetSuite, Oracle Cloud, HubSpot, BMC, Salesforce and other enterprise applications (the "Business"); and

WHEREAS, the Company desires to engage Employee, and Employee desires to be so engaged, to provide services on behalf of the Company in accordance with the terms and conditions set forth in this Agreement.

THEREFORE, for valid consideration received, the parties agree as follows:

1.      Engagement.  The Company hereby engages Employee to serve as Director of NetSuite Services - SMB, and Employee hereby accepts such engagement, on the terms and conditions set forth in this Agreement.  During the Term of Employee's engagement with the Company, Employee shall devote his full time, ability and attention to the business and affairs of the Company.  Employee shall use his best efforts to perform faithfully and efficiently the duties prescribed to him under this Agreement in accordance with his professional responsibilities and applicable law.

2.      Duties.  Employee shall perform the duties and responsibilities commensurate with the title of Director of NetSuite Services - SMB, together with such other reasonable additional duties as may be prescribed from time to time by the Company's management team, taking into account Employee's education, experience and job responsibilities.

3.      Compensation.

(a)      Base Salary.  As compensation for the services rendered by Employee under this Agreement, the Company shall pay to Employee a base annual salary of Two Hundred Thousand Dollars ($200,000) (prorated for any partial year) (the "Base Salary").  Employee's Base Salary shall be paid in regular intervals consistent with the payroll policies established by the Company from time to time.

4.      Benefits and Expenses.

(a)      Participation in Benefit Plans.  Employee shall be entitled to participate, subject to legal requirements, eligibility and other terms generally established by the plan documents, in the benefit plans as adopted or amended by the Company from time to time.

(b)      Vacation, Etc.  Employee shall be entitled to paid time off for vacation, illness, etc., consistent with the Company's policies for its employees, as adopted and amended from time to time.

(c)      Expenses.  The Company shall reimburse Employee for all reasonable business expenses incurred by Employee in performing his duties under this Agreement, provided Employee timely submits receipts to the Company in satisfactory form and in accordance with the Company's reimbursement policy.

DocuSign Envelope ID: 824671B7-6504-4ACA-BA36-25C74CC5PDDC

Employment Agreement                                                                     Page 2

5.    <u>Term and Termination</u>.  The term of Employee's engagement with the Company shall commence on the Effective Date and shall continue for a period of up to Six (6) months unless earlier terminated as follows (the "<u>Term</u>"):

(a)    <u>Termination by Employee without Good Reason</u>.  Employee may terminate his engagement with the Company at any time, with or without Good Reason (defined below), upon providing to the Company ninety (90) days' prior written notice; <u>provided</u>, <u>however</u>, that upon receipt of such written notice from Employee, the Company may immediately terminate Employee's engagement;

(b)    <u>Termination by the Company without Cause</u>.  The Company may terminate Employee's engagement at any time, without Cause, upon providing to Employee ten (10) days prior written notice.

(c)    <u>Termination by the Company for Cause</u>.  The Company may terminate Employee's engagement immediately upon written notice for "<u>Cause</u>", which shall mean:

(i)    Employee's material breach of this Agreement, and failure to cure such breach within thirty (30) days after the Company notifies Employee in writing of the breach;

(ii)    Employee's repeated instances of insubordination that continue after written notice thereof to Employee;

(iii)    Employee engaging in fraud, dishonesty, or other negligence or willful misconduct in the performance of his duties on behalf of the Company, including misappropriation of the Company's property;

(iv)    Employee engaging in conduct bringing the Company into substantial and material public disgrace that has a substantial impact on the Company or its affiliates; or

(v)    Employee's commission of any crime which is a felony or any crime involving embezzlement or dishonesty.

(d)    <u>Termination by Employee for Good Reason</u>.  Employee may terminate this Agreement at any time for Good Reason by sending written notice to the Company specifying the Good Reason condition.  Upon receipt of such notice, the Company will have thirty (30) days during which it may remedy the Good Reason condition and not be required to provide for Severance (defined below) as a result of such proposed resignation.  If the Good Reason condition is not remedied within such thirty (30) day period, Employee may resign based on the Good Reason condition specified in the notice effective no later than thirty (30) days following the expiration of Company's thirty (30) day cure period.  For purposes of this Agreement, "<u>Good Reason</u>" means, without Employee's written consent, (i) any material breach by the Company of any of the material provisions of this Agreement; (ii) materially changing Employee's title and duties; or (iii) changing Employee's primary worksite to a location more than fifty (50) miles from the present site.

(e)    In the event Employee's engagement with the Company is terminated pursuant to subsections 5(a) or 5(c), the Company shall only be obligated to pay to Employee that portion of his Base Salary and benefits, if any, earned by Employee up to and including the date of termination (the "<u>Employment Termination Date</u>").  If, however, Employee's engagement with the Company is terminated pursuant to subsections 5(b) or 5(d), Employee shall be eligible to receive continuation of his regular Base Salary for, in the case of subsection 5(b), two (2) months, and, in the case of subsection 5(d), one month, following the Employment Termination Date, in equal instalments commencing on the first regular payroll

date following the effective date of the Release (defined below), in accordance with Company's usual and customary payroll practices and subject to the conditions below ("Severance"). Payment of any Severance is contingent upon Employee (i) complying with all terms and conditions of this Agreement in all respects, as well as the Restrictive Covenant Agreement (defined below); and (ii) executing and delivering to the Company a full general release agreement in a form that is satisfactory to the Company (the "Release"), within sixty (60) days following the Employment Termination Date.

6.      Confidentiality. Employee acknowledges that the Company currently possesses, will develop and will come into possession of information that is owned by or may be valuable to the Company and its customers. Employee will not use, exploit, reveal, divulge or make known to any person, firm, corporation or entity, any information or materials supplied by the Company or its customers to Employee or otherwise learned by Employee during his engagement with the Company, including without limitation, accounting and financial information, customer lists and customer information, mailing lists, data bases, pricing, operating records, marketing strategies, processes, plans or other records, business practices and strategies, and commercial and other information or data, whether communicated in writing, orally, by observation or other sensory detection (individually and collectively, "Confidential Information"). The Confidential Information shall also include all letters, memoranda, notes, reports and other documents containing or referencing the Confidential Information, and all copies, reproductions and extracts thereof, prepared by Employee, the Company or its customers, employees or agents.

7.      Restrictive Covenants. This Agreement is being entered into in connection with a certain Asset Purchase Agreement of even date herewith (the "APA"), to which Employee is a party. As required by the APA, Employee, among other parties, has executed and delivered to the Company a certain Confidentiality, Non-Competition and Non-Solicitation Agreement of even date herewith (the "Restrictive Covenant Agreement"), which the parties hereto acknowledge and agree is incorporated herein by reference.

8.      Work Product. During Employee's employment with the Company, Employee may develop or conceive, in whole or in part, alone or with others, plans, manuals, handbooks, inventions, discoveries, improvements, trade secrets, secret processes and any technology, know-how or intellectual property, which results from any work Employee may do for or at the request of the Company (collectively, "Work Product"). All such Work Product will be deemed "work for hire" in accordance with the U.S. Copyright Act and shall be the Company's exclusive property, whether or not developed or made during business hours or with the use of the Company's facilities, equipment, materials, or personnel. Employee will promptly report all Work Product to the Company. Employee will assist the Company as necessary in obtaining patents or other protections for such Work Product.

9.      Return of Company Property. All records, data, papers, notes, software, customer lists, files, keys, equipment, and books of the Company, including Confidential Information, are and shall remain the property of the Company. Upon termination of Employee's engagement with the Company, Employee shall return all such property, including all copies and reproductions thereof, to the Company. Additionally, Employee shall not delete any information from the Company's systems, laptops, desktops or other electronic devices and shall return all such equipment upon termination of Employee's engagement in the same state that it was in prior to termination.

10.      At-Will Acknowledgment. Employee acknowledges that his engagement with the Company is at-will, and either Employee or the Company may terminate the engagement at any time in accordance with Section 5, for any reason or for no reason. This at-will status may not be altered or modified except in a written agreement signed by both Employee and the Company that expressly references and purports to modify this Agreement.

DocuSign Envelope ID: 834671B7-6504-4ACA-BA36-25C74CC5DDDC

11.     Notice.  All notices and other communications shall be in writing and effective (a) upon receipt if hand delivered, (b) upon transmission if sent by facsimile (with confirmation of transmittal) and confirmed by U.S. mail, (c) one (1) business day after dispatch by a nationally recognized overnight delivery service, or (d) five (5) days after mailing by certified or registered mail, return receipt requested, to the address which any party shall have previously notified the other party in writing.  Any such notice not contemplated above shall be effective upon receipt.

12.     Time Limit of Claims.  Following the termination of Employee's engagement with the Company for any reason Employee agrees to file any action or suit relating to Employee's engagement with the Company within one hundred eighty (180) calendar days (or in less time if any applicable law so requires) of the termination date.  This agreement includes, but is not limited to any action or suit related to Employee's termination, discrimination claims, claims for wages, salary, commissions, or expenses.  Employee agrees to waive any state or federal statutes of limitation to the contrary (except those requiring a shorter period).  While Employee understands that the statute of limitations for claims arising out of this Agreement may permit a greater period of time to file, Employee agrees and understands that any action that is the subject of a lawsuit or action following the termination of Employee's engagement is barred if it is not filed within the one hundred eighty (180) day period (or in less time if any applicable law so requires) immediately following the termination of Employee's engagement with the Company and Employee understands and agrees that the one hundred eighty (180) day period (or applicable shorter period) will not be extended for any reason, including continuing violations.  This provision does not prohibit the timely filing of a charge with any administrative agency, but unless filed within one hundred eighty (180) days (or in less time if any applicable law requires) following the termination of Employee's engagement, Employee waives the right to recover money damages or other relief as permitted by law.

13.     Survival.  The provisions of this Agreement which by their nature are intended to survive the termination, cancellation, completion or expiration of this Agreement, including, without limitation, the restrictive covenants set forth herein, shall continue as valid and enforceable obligations of the parties notwithstanding any such termination, cancellation, completion or expiration.

14.     Waiver.  No term or condition of this Agreement shall be deemed waived other than by a writing signed by the party against whom or which enforcement of the waiver is sought.  Without limiting the generality of the preceding sentence, a party's failure to insist upon the other party's strict compliance with any provision of this Agreement or to assert any right that a party may have under this Agreement shall not be deemed a waiver of that provision or that right.  Any written waiver shall operate only as to the specific term or condition waived under the specific circumstances and shall not constitute a waiver of that term or condition for the future or a waiver of any other term or condition.

15.     Entire Agreement; Amendment.  This Agreement, together with the Restrictive Covenant Agreement, constitutes the entire agreement between the parties with respect to its subject matter and supersedes all other agreements, whether oral or written, between the parties with respect to such subject matter.  This Agreement may be amended only by a written agreement executed by each of the parties hereto.

16.     Severability.  If any provision of this Agreement is or becomes invalid or unenforceable, that provision (to the extent invalid or unenforceable) shall be deemed amended or reformed to the extent required to render it valid and enforceable, and the remainder of this Agreement shall be unaffected and shall continue in effect.

17.     Assignment.  No party may assign their rights hereunder without the prior written consent of the other, except that the Company may assign its rights to any affiliate or successor entity without the consent of Employee.

DocuSign Envelope ID: 824671B7-6504-4ACA-BA36-25C74CC5PDDG

18.     <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without regard to any applicable principles of conflicts of laws.

19.     <u>Arbitration</u>.  With the exception of the right to seek injunctive relief pursuant to the Restrictive Covenant Agreement, any controversy or claim arising out of or relating to this Agreement, including the making and entering into thereof, shall be subject to final and binding arbitration in Oakland County, Michigan, in accordance with the rules of the American Arbitration Association then in effect. Any such arbitration shall be treated as non-complex and assigned to a single arbitrator.  The Arbitrator shall be instructed to find in favor of one or another party and to award to the prevailing party, in addition to whatever damages the Arbitrator deems just under the circumstances, all reasonable costs incurred by the prevailing party in the dispute resolution process.  The judgment of the Arbitrator shall be entered in any court having jurisdiction thereof.  Either party shall be entitled to collect from the other any reasonable costs and attorneys' fees incurred in the collection of any judgments.

20.     <u>Counterparts; Facsimile</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered by facsimile or electronic transmission, and a facsimile or electronic version of this Agreement or of a signature of a party will be effective as an original.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**[SIGNATURE PAGE FOLLOWS]**

WHEREFORE, the undersigned have executed this Agreement as of the date first set forth above.

**COMPANY:**

GLOBAL SYSTEMS INTEGRATION, INC.,
a Georgia corporation

By: _____

Digitally signed by William Cashman
DN: cn=William Cashman, o=GSI, Inc.,
ou, email=bill.cashman@getgsi.com,
c=US
Date: 2022.01.25 13:44:27 -05'00'

Its:  CFO


**EMPLOYEE:**

_____

PERRY KOUNTOURIOTIS

DocuSign Envelope ID: 824671B7-6504-4ACA-BA36-25C74CC5DDDC

Employment Agreement                                                        Page 6

---

WHEREFORE, the undersigned have executed this Agreement as of the date first set forth above.

**COMPANY:**

GLOBAL SYSTEMS INTEGRATION, INC.,
a Georgia corporation


By:_____

Its:


**EMPLOYEE:**

_____
PERRY KOUNTOURIOTIS

# Exhibit E

## AFFIDAVIT OF PERRY KOUNTOURIOTIS

STATE OF MICHIGAN )
)SS:
COUNTY OF Oakland )

I, Perry Kountouriotis, affiant, being first duly sworn, deposes and states as follows:

1. I have personal knowledge of the facts recited herein and can testify to them competently if called and sworn as a witness.

2. I was previously employed by Global Systems Integration, Inc. ("GSI") from January 26, 2023 until January 31, 2026 when I resigned my position.

3. Although Switchback was formed while I was employed at GSI, I was simply preparing to do business but did not perform services for or on behalf of Switchback that would be competitive with GSI and, likewise, I did not use any GSI time, GSI resources, or GSI confidential information or trade secrets to or for the benefit of Switchback or any other person or entity.

4. After Switchback was formed and while I was still employed by GSI as a part-time employee working 24 hours per week doing Sales, I devoted my efforts to selling projects for GSI and continued to perform my other assigned job duties as I had always done in the past.

5. After Switchback was formed and while I was still employed by GSI, I did not divert GSI projects or opportunities to Switchback.

6. After Switchback was formed and while I was still employed by GSI, I sold many deals for GSI including their largest ever NetSuite deal, which was quoted at $1,000,000. I closed this deal right before I left GSI. I also worked with Jeff Wilk as his

Solution Consultant and helped him close NetSuite deals including a very large NetSuite brand new implementation.

7.      After Switchback was formed and while I was still employed by GSI, I, again, did not use any confidential or proprietary information for the benefit of Switchback.

8.      After Switchback was formed and while I was still employed by GSI, I acted in the best interests of GSI and, at no time did I intentionally act against those interests.

9.      After Switchback was formed and while I was still employed by GSI, to my knowledge, none of my actions caused GSI to lose business and, to the contrary, I worked diligently until my departure from GSI to continue to close business on its behalf.

10.      I did not improperly synchronize a non-GSI device after resigning my position and the allegations to the contrary are simply incorrect.

11.      GSI purchased Cloud Genius Advisors, a company formed by me and Jonathan Kozell (which closed on January 26, 2022).  From that day forward I used my personal laptop until my last day of employment at GSI.

12.      After the acquisition of Cloud Genuis Advisors, the GSI IT Department wanted to install a form of tracking software on my laptop. I explained to them that this was my personal laptop, and I did not feel comfortable with them managing my laptop and installing additional software.  As a result, GSI sent me a GSI owned/issued laptop.

13.      Over the 4 years at GSI, I used both laptops for work and my personal laptop for personal use.  The GSI IT department was well aware of the fact that I was connected to the One Drive account, and I was never told to disconnect.

2

14.     After I provided notice to GSI that I was resigning my position, I asked them if I could purchase the GSI laptop; as my personal laptop was several years old, I was having problems with it.  GSI declined my request.

15.     Thereafter, on January 10, 2026, GSI claims that I connected a non-GSI device and downloaded all my GSI files.

16.     This allegation is simply factually false.  Instead, this was my GSI One Drive account that has always been connected to my personal laptop since the day I started working at GSI.  My One Drive was set up to sync both ways.  I would save a file on my laptop, and that file would automatically sync to my One Drive account.  That file would also sync to my GSI laptop as that was connected as well.

17.     Again, GSI's allegation that my personal laptop was first connected to my GSI OneDrive account on or about January 10, 2026, is factually incorrect; my personal laptop had been connected to my GSI OneDrive account since January 2022, following GSI's acquisition of Cloud Genius Advisors, and I took no other independent action to sync or download GSI information.

18.     The allegation that I retained or copied confidential information is incorrect.

19.     I did not copy GSI confidential information for my own use or for Switchback's benefit.  I have not used GSI confidential information or internal documents to operate Switchback.

20.     Switchback does not rely upon or use any GSI documents or work products.

21.     The allegation that I used GSI confidential information at Switchback is incorrect.

22. GSI confidential information was not used to create Switchback. To the contrary, Switchback intentionally created many of its business processes differently from GSI so as to better serve Switchback clients and to sell its services.

23. There are significant differences between GSI and Switchback including the sales process, the CRM tool and items tracked in the sales pipeline, the timekeeping system, the accounting system, the payroll software, the 401K and benefits provider, the project management system, the electronic signature software for signing contracts, managed services process, and others.

24. GSI is a NetSuite Solution provider. Switchback is a NetSuite Alliance partner. Both partner programs provide extensive resources directly from NetSuite including implementation methodologies, best practices, sales training, and product training.

25. For any new NetSuite deal that Switchback is involved with, a NetSuite Sales Rep is involved in and running the sales process.

26. The allegation that Switchback, or any individuals, solicited GSI employees is incorrect.

27. I have known Jonathan Kozell for over 35 years. He is one of my closest friends and lives 8 houses down from me in the same neighborhood.

28. Emerald Morgan and Ryan Fast both worked for Jon and me at Cloud Genius. Our professional and personal relationship with both Emerald and Ryan existed many years before GSI employed any of us. I am aware that each of the four of us was seriously concerned about the issues at GSI prior to our resignations.

4

29. The formation of Switchback is a result of longtime friendship and business partnership, and the departure of any of the four of us was not based upon solicitation but, instead, collaboration.

30. The allegation that Switchback or any of its employees or representatives have solicited GSI clients is incorrect.

31. Switchback has not solicited any GSI clients.

32. In fact, there are instances where Switchback declined to work with a GSI client. One example is Convention & Show. Switchback declined to work directly with that client and, thereafter, GSI sub-contracted Switchback to do work for that client.

33. Similar situations occurred on other occasions as well including: Great Lakes Wine and Spirit (Sue Ann Wessel reached out to me because they were dissatisfied with GSI – I declined to work with then and suggested they reach out to Donielle Winslow at GSI for assistance), Convention and Show (declined work), Grobstine Tepple (declined work), Fortiss, Doctors Implants and Togerson's (performed subcontract work with GSI's knowledge and consent and at GSI's request and on its behalf).

34. Oakwood Veneer was not solicited by Switchback.

35. Oakwood Veneer contacted Emerald seeking NetSuite assistance.

36. Oakwood Veneer was originally a Cloud Genius Advisors client before becoming a GSI client through the acquisition of Cloud Genius.

37. Prior to the acquisition, GSI had referred Oakwood Veneer to Cloud Genius because the project budget was too small for GSI to perform the work.

5

38. Switchback provides NetSuite consulting services, which are like the services provided by many NetSuite Consulting firms, including GSI.

39. Similarities in the services provided are the result of both companies implementing the same NetSuite software, not the result of Switchback using GSI confidential information or trade secrets (assuming there are any).

40. Any former GSI clients that chose to work with Switchback did so based on their own independent business decisions and were not solicited by Switchback or any of its employees or representatives.

41. Switchback did not use GSI confidential information, trade secrets customer data, pricing, or proprietary work product to obtain or service those clients.

42. While the underlying NetSuite consulting services may be similar, Switchback has developed its own sales process, managed services program, pricing model, customer engagement process, contracts, and internal business practices.

43. Switchback was not built using GSI trade secrets or confidential information but was instead built on the experience, knowledge, and professional relationships of its owners, all of whom had years of NetSuite consulting experience prior to and during their employment with GSI.

44. I have over 30 years of experience of Implementing and selling accounting systems. I have over 15 years of experience as either a practice manager or business owner implementing accounting systems. Switchback is now my 3rd company where I started a NetSuite practice.

6

45. As noted above, Jon Kozell and I founded Cloud Genius Advisors years before GSI acquired the company in January 2022 and Ryan Fast and Emerald Morgan worked for Cloud Genius Advisors before becoming GSI employees through the acquisition.

46. The owners' knowledge and experience were developed over many years in the NetSuite consulting industry and were not created by GSI.

47. GSI is a NetSuite Solution Provider, and Switchback is a NetSuite Alliance Partner. Both partner programs provide extensive implementation methodologies, sales training, enablement materials, best practices, and documentation directly from NetSuite.

48. The methodologies and processes used by Switchback are based on NetSuite's guidance, industry experience, and our own professional judgment, not GSI trade secrets, confidential information or otherwise.

49. Switchback independently developed its own contracts, proposals, managed services program, pricing approach, sales process, CRM processes, and internal business operations.

50. Many aspects of Switchback's business model were intentionally designed differently from GSI's.

51. Switchback does not use GSI's internal documents, customer information, pricing data, CRM information, or proprietary work product in operating its business.

52. GSI has a prior business relationship with Switchback.

53. After Ryan and Emerald left GSI, GSI knowing Ryan and Emerald were at Switchback, engaged Switchback to perform consulting services.

7

54.     GSI subcontracted Switchback on multiple client engagements.

55.     GSI was fully aware that Switchback was owned by former GSI employees.

56.     At no time during my employment with GSI or thereafter did I solicit, recruit, or otherwise interfere with GSI's employees and will not do so unless and until any contractual restrictions in regard to the same have expired.

57.     All former GSI clients that are now clients of Switchback were not solicited by me, Switchback our any other representatives of Switchback but, instead, those current clients solicited Switchback to work with them due to problems they were having with GSI as detailed in each of their affidavits.

58.     To the extent there is a claim by GSI that I was exposed to or had or have possession of information that qualifies as confidential information or trade secrets, I confirm by this sworn statement that I have not used or disclosed any GSI information, nor will I do so in the future, whether said information would qualify as confidential information, trade secret information or otherwise.

I swear the foregoing is true to the best of my knowledge information and belief.

_P. Koun_
Perry Kountouriotis

Subscribed and sworn to before me this
14th day of July 2026

_Amanda Hepola-Gomez_, Notary Public
_Oakland_ County, State of Michigan
My Commission Expires: March 6, 2028
Acting in _Oakland_ County

AMANDA HEPOLA-GOMEZ
NOTARY PUBLIC, STATE OF MI
COUNTY OF OAKLAND
MY COMMISSION EXPIRES Mar 6, 2028
ACTING IN COUNTY OF

4935-7935-5069

8